**STATE of Indiana, Appellant (Plaintiff Below),**

v.

**Timothy P. McLAUGHLIN, Appellee (Defendant Below).**

No. 4–883 A 255.

Court of Appeals of Indiana, Fourth District.

Nov. 19, 1984.

Rehearing Denied Feb. 5, 1985.

John H. Meyers, Pros. Atty., Edward A. Diersen, Deputy Pros. Atty., Lafayette, Linley E. Pearson, Atty. Gen., Indianapolis, for appellant.

Jeffrey Helmerick, Smith Helmerick & Smith, William E. Emerick, Stuart & Branigin, Lafayette, for appellee.

MILLER, Presiding Judge.

At about 11:00 P.M. on the Saturday of Labor Day Weekend, 1982, defendant-appellee, Timothy McLaughlin, was driving his car south on Indiana State Road 43 in Tippecanoe County, a few miles north of Lafayette. He was driving within the 55 miles-per-hour speed limit on this curving, two-lane road, and his car was in good, safe operating condition. On a flat, straight stretch of this road, near the entrance to the Soldiers Home, a number of bright-burning flares had been set in the middle of the road by state police officers. Three or four police cars were parked on either side of the road with their rear deck warning lights flashing red. There was no warning sign, and nothing in sight told McLaughlin exactly why he was being stopped. Approaching a line of seven uni-

formed police officers standing in the middle of the road, McLaughlin was signalled to stop by a state trooper, who asked him to produce his driver's license and vehicle registration.

Under these circumstances, McLaughlin was detained at a police roadblock established primarily for the purpose of detecting and apprehending drunk drivers. When State Trooper Richard Jozwiak asked to see McLaughlin's driver's license and vehicle registration, he noticed the scent of alcohol on McLaughlin's breath and the bloodshot appearance of his eyes. Officer Jozwiak asked McLaughlin to park his car on the right shoulder of the road, which was widened to four lanes at the entrance of the Soldiers Home. At the side of the road, Officer Jozwiak asked McLaughlin if he would take an "alco-sensor" test, which is a field test, similar to a breathalyzer, that gives the officer in the field an estimate of the subject's blood alcohol content. McLaughlin consented to take the test, which indicated a blood alcohol content of .13%. Officer Jozwiak then asked if he would take a breathalyzer test, and McLaughlin again consented. He was placed in the back seat of Officer Jozwiak's police car and driven to the Tippecanoe County Jail, where the breathalyzer test was administered, which also revealed a blood alcohol content of .13%. Officer Jozwiak then wrote out an information and summons on McLaughlin, charging him with driving while intoxicated, in violation of IND.CODE section 9–4–1–54(b) (1982).[1]

McLaughlin subsequently filed a motion to suppress evidence of the breathalyzer test result and all other evidence obtained after the initial stop of his automobile on the ground that his detention, search and arrest were in violation of the fourth and fourteenth amendments to the United States Constitution and Article I, section 11 of the Indiana Constitution. The trial court granted the motion to suppress and denied the State's motion to correct errors.

■ The State now argues this appeal pursuant to IC 35–1–47–2(5),[2] which authorizes the State to appeal "[f]rom an order granting a motion to suppress evidence, if the ultimate effect of the order is to preclude further prosecution." The suppression order in this case applied to the breathalyzer test result and other fruits of the allegedly illegal detention of McLaughlin. Inasmuch as the State concedes that nothing in the manner in which McLaughlin was driving prior to his detention indicated he was driving while intoxicated, the suppression order would have the effect of making the State's case impossible to prove. Thus, "the order is tantamount to dismissal and therefore appealable." *State v. Williams*, (1983) Ind.App., 445 N.E.2d 582, 584.

■ We wish to make clear the precise issue we decide today: Whether the seizure of this defendant under the circumstances of this roadblock was unreasonable under the fourth and fourteenth amendments[3] to the United States Constitution?[4] The trial

---

1. Repealed by Act of April 19, 1983, P.L. 143–1983, § 9, 1983 Ind.Acts 989, 1003. For the current law, see IND.CODE § 9–11–2–1 to –5 (Supp.1983).

2. Repealed by Act of April 22, 1983, P.L. 311–1983, § 49, 1983 Ind.Acts 1861, 1922. For current law, see IND.CODE § 35–38–4–2 (Supp. 1983).

3. The fourth amendment provides:

"The right of the people to be secure in the persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U.S. CONST. Amend. IV. State and local law enforcement agencies are subject to the requirements of the fourth amendment by operation of the due process clause of the fourteenth amendment. *Mapp v. Ohio*, (1961) 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. The terms of the Indiana Constitution's protection against unreasonable search or seizure are nearly identical to those of the fourth amendment. *See* IND. CONST. art. I, § 11.

4. There is no issue presented concerning the search or arrest of defendant. After the initial seizure, Officer Jozwiak's observation of defendant's bloodshot eyes and the scent of alcohol on his breath constituted an objective manifesta-

court held the seizure of defendant unreasonable and ordered the fruits thereof suppressed on the ground that this roadblock was not conducted according to administrative guidelines that qualified as "previously specified Neutral Criteria." (R. 32) *See Delaware v. Prouse,* (1979) 440 U.S. 648, 662, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (citing *Marshall v. Barlow's Inc.,* (1978) 436 U.S. 307, 323, 98 S.Ct. 1816, 1826, 56 L.Ed.2d 305). We will affirm the action of the trial court if any valid ground exists to support it. *Hyde v. State,* (1983) Ind., 451 N.E.2d 648, 650; *Bruce v. State,* (1978) 268 Ind. 180, 200, 375 N.E.2d 1042, 1054. Because we believe the state failed to sustain its burden of proving the roadblock seizure was reasonable under the fourth amendment, we affirm.

### BACKGROUND

 Although the fourth amendment protects only reasonable expectations of privacy, *Katz v. United States,* (1967) 389 U.S. 347, 351–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576; *id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring), a motorist surrenders neither his reasonable expectations of privacy nor the protections of the fourth amendment when he steps into his automobile. *Delaware v. Prouse,* (1979) 440 U.S. 648, 662–63, 99 S.Ct. 1391, 1400–01, 59 L.Ed.2d 660. It is well settled that a "seizure," within the meaning of the fourth amendment, occurs when a law enforcement agent detains an automobile and its occupants for even a brief time. *E.g., Delaware v. Prouse,* 440 U.S. at 653, 99 S.Ct. at 1396; *United States v. Martinez-Fuerte,* (1976) 428 U.S. 543, 556–58, 96 S.Ct. 3074, 3082–83, 49 L.Ed.2d 1116; *cf.*

*Terry v. Ohio,* (1968) 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889.

"The essential purpose of the proscription in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcements agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions ...." ' *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820 [56 L.Ed.2d 305] (1978), quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field,' *Camara v. Municipal Court,* 387 U.S., at 532, 87 S.Ct., at 1733.

*Delaware v. Prouse,* 440 U.S. at 653–55, 99 S.Ct. at 1396–97 (footnotes omitted).

Although the United States Supreme Court has never ruled directly on the constitutionality of roadblock seizures for the purpose of detecting drunk drivers, the Court has provided some guidance for the

tion that defendant was engaged in the criminal act of driving while intoxicated, justifying the further investigatory detention of defendant at the roadside. *See United States v. Cortez,* (1981) 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621. The search of defendant and seizure of evidence of his intoxication, by means on the alco-sensor and breathalyzer tests, were justified by defendant's consent to those procedures. The results of those breath tests generated the probable cause to believe that defendant com-

mitted the misdemeanor offense of driving while intoxicated within the view of Officer Jozwiak, justifying defendant's arrest. *See* IND. CODE § 35-33-1-1(4) (1982); *Brown v. State,* (1982) Ind., 442 N.E.2d 1109, 1115. Thus, the question of the suppression of the evidence in this case turns solely on the constitutionality of the initial seizure of defendant at the roadblock, from which all evidence of defendant's intoxication flowed.

analysis of such seizures in two immigration control cases. In *United States v. Brignoni-Ponce*, (1975) 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607, the Court held that *random stops* of vehicles by Border Patrol agents near the Mexican border, for the purpose of determining whether the vehicles contained illegal aliens or were involved in smuggling operations, were violative of the fourth amendment. *Id.* at 883, 95 S.Ct. at 2581. However, the Court did not invalidate all warrantless stops of automobiles based on less than probable cause. Analogizing to *Terry v. Ohio, supra* the Court stated:

"In this case as well, because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry*, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' 392 U.S., at 29, 88 S.Ct. at 1884. The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."

*Brignoni-Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580.

In *United States v. Martinez-Fuerte*, (1976) 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116, the Supreme Court examined the constitutionality of the seizure of vehicles at *permanent checkpoint stops* operated by Border Patrol agents for the purpose of stemming the flow of illegal alien traffic from Mexico. At these permanent checkpoints, every vehicle arriving at the checkpoint location was slowed to a virtual halt, and certain vehicles were, at the agents' discretion, referred to a separate area for secondary questioning. Balancing the government's interest in the use of this practice against the intrusion on individual fourth amendment interests, the Court upheld the practice as constitutional. The intrusion factor in the balance was divided into two parts—objective intrusion ("the stop itself, the questioning, and the visual inspection [of the vehicle and its occupants]") and subjective intrusion ("the generating of concern or even fright on the part of lawful travellers"). *Id.* at 558, 96 S.Ct. at 3083. The Court found the level of objective intrusion in the permanent checkpoint stops to be about the same as in the random patrol stops condemned in *Brignoni-Ponce, supra;* however, the Court found the level of subjective intrusion to be greatly diminished in the permanent checkpoint situation:

"In [*United States v. Ortiz*, (1975) 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623], we noted:

'[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.' 422 U.S., at 894–895, 95 S.Ct. at 2587.

In *Brignoni-Ponce*, we recognized that Fourth Amendment analysis in this context also must take into account the overall degree of interference with legitimate traffic. 422 U.S., at 882–883, 95 S.Ct., at 2580–2581. We concluded there that random roving-patrol stops could not be tolerated because they 'would subject the residents of ... [border] areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers.... [They] could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road ....' *Ibid.* There also

was a grave danger that such unreviewable discretion would be abused by some officers in the field. *Ibid.*

Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review." [Footnote omitted.]

*Martinez-Fuerte*, 428 U.S. at 558–59, 96 S.Ct. at 3083–84.

In weighing the government's interest, the Court noted the important public interest in the problem of illegal alien traffic flowing into the United States and indicated their belief that the problem could not be controlled in a less intrusive yet equally effective manner. *See id.* at 556–57, 96 S.Ct. at 3082–83. On the balance, the Court upheld the constitutionality of the permanent checkpoint procedure, finding that the governmental and public interest in stopping the illegal alien traffic outweighed the minimal objective and subjective intrusion on fourth amendment rights the practice entailed. *Id.* at 562, 96 S.Ct. at 3085.

Although neither an immigration control nor a roadblock case, *Delaware v. Prouse, supra,* is probably the most significant of the Supreme Court decisions bearing on the issue before this court. In *Prouse*, a patrolman in a police cruiser stopped the defendant in his car to check the defendant's driver's license and vehicle registration. The patrolman had not observed any traffic or equipment violation, nor any suspicious activity, on the defendant's part. While checking the defendant's driver's license, the patrolman observed some marijuana in plain view in the defendant's car, seized it, and arrested the defendant. The trial court granted the defendant's motion to suppress evidence of the marijuana, and the United States Supreme Court affirmed, holding that the state's interest in conducting discretionary spot checks of drivers' licenses and vehicle registrations did not outweigh the resulting intrusion on the fourth amendment interests of the driver detained. 440 U.S. at 658–59, 99 S.Ct. 1398–99.

In weighing the government's interest in conducting these discretionary spot checks, the Court noted the absence of empirical data in the record that would indicate that finding an unlicensed driver "by choosing randomly from the entire universe of drivers" was any more likely than finding one "among those who commit traffic violations," the observation of and action upon which comprises the traditional method of traffic and vehicle safety law enforcement.[5]

---

5. The Supreme Court noted that "drivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves." 440 U.S. at 659, 99 S.Ct. at 1399. A footnote appended to this statement directed the reader to compare it with the following, from *United States v. Brignoni-Ponce:*

"We are not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic. As we discuss in Part IV, *infra,* the nature of illegal

*Id.* at 659, 99 S.Ct. at 1399. Thus, the Court required some evidence that the law enforcement practice in question actually promoted the government interest asserted to justify the intrusion on fourth amendment interests to a greater degree than other law enforcement practices based on individualized suspicion.

In addition, the Court emphasized the importance that the discretion of law enforcement officers in the field be limited:

"The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure—limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches ....' *Terry v. Ohio,* 392 U.S., at 22, 88 S.Ct., at 1880. By hypothesis, stopping apparently safe drivers is necessary only because the danger presented by some drivers is not observable at the time of the stop. When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil

the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed at least to some extent. [Citations omitted.]"

440 U.S. at 661, 99 S.Ct. at 1400.

Finally, the Court in *Prouse* rejected the state's argument that the danger of abuse of discretion by police officers was diminished because the automobile is subject to considerable state regulation, resulting in a great deal of police-citizen contact:

"Only last term we pointed out that 'if the government intrudes .... the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or other regulatory standards.' *Marshall v. Barlow's, Inc.,* [(1978) 436 U.S. 307, 312–13, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305]. There are certain 'relatively unique circumstances,' *id.,* at 313, 98 S.Ct., at 1820, in which consent to regulatory restrictions is presumptively concurrent with participation in the regulated enterprise. [Citations omitted.] *Otherwise, regulatory inspections unaccompanied by any quantum of individualized, articulable suspicion must be undertaken pursuant to previously specified 'neutral criteria.'* *Marshall v. Barlow's, Inc., supra,* 436 U.S., at 323, 98 S.Ct. at 1826."

*Prouse,* 440 U.S. at 662, 99 S.Ct. at 1400 (emphasis added).

It appears the trial court relied on the emphasized language above in granting defendant's motion to suppress. *See, supra* at 1129–1130.

Despite its apparent disapproval of the practice of seizing motorists in the absence of some level of individualized suspicion, the *Prouse* decision probably encouraged the use of drunk driving roadblocks, includ-

---

alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators. Consequently, a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas

from indiscriminate official interference. Under the circumstances, and even though the intrusion incident to a stop is modest, we conclude that it is not 'reasonable' under the Fourth Amendment to make such stops on a random basis."

422 U.S. at 883, 95 S.Ct. at 2581.

ing the one in question here, *see* Appendix at 1142–43, with some dicta that followed the holding in the case:

"[W]e hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. *Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.* We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers."

440 U.S. at 663, 99 S.Ct. at 1401 (emphasis added).

■ Since the *Prouse* decision, some refinements have been made in the analysis of fourth amendment seizure cases, both by the United States Supreme Court and by the numerous state courts that have considered roadblock seizures similar to the one presently before us. In *Brown v. Texas*, (1979) 443 U.S. 47, 49, 99 S.Ct. 2637, 2639, 61 L.Ed.2d 357, the Supreme Court stated the balancing test to be used in the case of a seizure such as the one here in question:

"The reasonableness of seizures that are less intrusive than a traditional arrest, [citations omitted] depends ' "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." ' *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct., at 2578. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. *See, e.g.,* 422 U.S., at 878–883, 95 S.Ct., at 2578–2581.

· A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. *See Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce, supra,* 422 U.S., at 882, 95 S.Ct., at 2580. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. *Delaware v. Prouse, supra,* at 663, 99 S.Ct., at 1401. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 558–562, 96 S.Ct. 3074, 3083–3085, 49 L.Ed.2d 1116 (1976)."

*Brown v. Texas*, 443 U.S. at 50–51, 99 S.Ct. at 2640.

Our survey of the state court cases, in which a fourth amendment challenge was made to the admissibility of evidence obtained at a police roadblock established with the detection of drivers under the influence as either a primary or secondary purpose, reveals an even split in the decisions. Five decisions have upheld, as consistent with the fourth amendment, the conduct of the DUI roadblock in question. *See State v. Deskins*, (1983) 234 Kan. 529, 673 P.2d 1174; *Kinslow v. Commonwealth*, (1983) Ky.Ct.App., 660 S.W.2d 677; *State v. Coccomo*, (1980) 177 N.J.Super. 575, 427 A.2d 131; *People v. Scott*, (1983) 122 Misc.2d 731, 471 N.Y.S.2d 964; *People v. Peil*, (1984) 122 Misc.2d 617, 471 N.Y.

S.2d 532. Five other decisions have found the conduct of the roadblock in question violative of the fourth amendment. *See State ex rel. Ekstrom v. Justice Court,* (1983) 136 Az. 1, 663 P.2d 992; *People v. Bartley,* (1984) 125 Ill.App.3d 575, 80 Ill. Dec. 894, 466 N.E.2d 346; *Commonwealth v. McGeoghegan,* (1983) 389 Mass. 137, 449 N.E.2d 349; *State v. Smith,* (1984) Okla. Crim.App., 674 P.2d 562; *State v. Olgaard,* (1976) S.D., 248 N.W.2d 392. In addition, other courts have considered the constitutionality of roadblocks conducted for other purposes. *See United States v. Prichard,* (10th Cir.1981) 645 F.2d 854 (evidence seized at roadblock conducted for purposes of checking drivers' licenses and vehicle registrations held admissible); *People v. Long,* (1984) 124 Ill.App.3d 1030, 80 Ill.Dec. 332, 465 N.E.2d 123 (evidence of driver's intoxication discovered at roadblock established to check drivers' licenses held admissible); *State v. Hilleshiem,* (1980) Iowa, 291 N.W.2d 314 (evidence seized at roadblock in city park to identify possible witnesses to ongoing park vandalism held inadmissible under fourth amendment); *State v. Baldwin,* (1984) N.H., 475 A.2d 522 (scope of questioning at roadblock held to exceed unconstitutionally its purpose, to check compliance with motor vehicle and fish and game laws); *Koonce v. State,* (1983) Tex.Crim.App., 651 S.W.2d 46 (evidence seized at roadblock to check drivers' licenses held inadmissible under fourth amendment).

The depth of analysis and decisive factors in these cases have varied greatly. A few courts have gone no further than to rely on the Supreme Court's dicta in *Delaware v. Prouse, supra,* upholding the roadblock in question as constitutional merely because all motorists who arrived at the roadblock were stopped and questioned. *See United States v. Prichard, supra; Kinslow v. Commonwealth, supra.* Other courts have relied heavily on the presence or absence of guidelines set by superior officers to control the discretion of the field officers who actually conducted the roadblock. *See State ex rel. Ekstrom v. Justice Court, supra; State v. Hilleshiem,*

*supra; State v. Coccomo, supra; People v. Scott, supra; People v. Peil, supra; State v. Olgaard, supra; Koonce v. State, supra; see also supra* at 1129–1130 (order of trial court). Two courts that found the roadblocks violative of the fourth amendment relied, in part, on the prosecution's failure to show the roadblock method more effective than traditional methods of enforcing drunk driving laws. *See State ex rel. Ekstrom v. Justice Court, supra; People v. Bartley, supra; see also State v. Deskins, supra,* 673 P.2d at 1186, 1188 (Prager, J., dissenting).

■ One of the most thorough analyses of this issue was made by the Supreme Court of Kansas in *State v. Deskins, supra,* where it was stated:

"In applying the balancing test of the degree of governmental or public interest against the degree of intrusion upon the individual's constitutionally protected rights, the courts have developed a three-factor test or analysis which was stated in *Brown* as:

'... [A] weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' *Brown v. Texas,* 443 U.S. at 50–51, 99 S.Ct. at 2640–2641.

Numerous conditions and factors must be considered in determining whether a DUI roadblock meets the balancing test in favor of the state. Among the factors which should be considered are: (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of op-

eration; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test. Not all of the factors need to be favorable to the state but all which are applicable to a given roadblock should be considered. Some, of course, such as unbridled discretion of the officer in the field, would run afoul of *Prouse* regardless of other favorable factors."

673 P.2d at 1184–85.

Using the above factors as a guide, we now proceed to examine the conduct of the roadblock in the present case in light of the balancing test enunciated in *Brown v. Texas, supra.*

## DECISION

■■ At the outset, we note that the state has the burden of proving that a seizure conducted by law enforcement agents without a warrant falls within an exception to the warrant requirement. *Lance v. State,* (1981) Ind., 425 N.E.2d 77, 78; *Bruce v. State,* (1978) 268 Ind. 180, 228, 375 N.E.2d 1042, 1068. We will recognize the validity of a warrantless seizure short of arrest when the state proves it was justified by probable cause or reasonable suspicion, *Delaware v. Prouse, supra; Terry v. Ohio, supra,* or when the state proves that "the gravity of the public concerns served by the seizure [and] the degree to which the seizure advances the public interest [outweigh] the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. at 50–51, 99 S.Ct. at 2640–41. Because the state concedes defendant was not stopped on the basis of any individualized suspicion, it bears the burden of proving the *Brown* test balances in favor of this seizure. In reviewing the trial court's ruling on the motion to suppress, we will consider only the evidence most favorable to the ruling together with any adverse evidence that is uncontradicted. *Lance v. State, supra; Bruce v. State, supra.*

■■ The first element of the *Brown* balancing test is the gravity of the public concern served by the seizure. Although the state presented no evidence on this point at the hearing on the motion to suppress, we may take judicial notice that the costs—in terms of dollars and human suffering—generated by the drunk driver is among the most pressing social problems of our time. The United States Supreme Court has recognized this problem in several of its opinions. *See, e.g., South Dakota v. Neville,* (1983) 459 U.S. 553, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 ("The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here.") One estimate has placed the national death toll caused by drunk drivers at over 25,000 annually. Note, *Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock Seizures,* 71 GEORGETOWN L.J. 1457, 1457 n. 1 (citing H.R.REP. NO. 867, 97th Cong., 2d Sess. 7, *reprinted in* 1982 U.S.CODE CONG. & AD.NEWS 3367, 3367). In Indiana, the Governor's Task Force to Reduce Drunk Driving estimates that over 7,000 Hoosiers were injured and more than 220 were killed in alcohol-related automobile accidents in 1982. *Indiana Drunk Driving Fact Sheet,* Appellant's Reply Brief, Appendix. The Indiana legislature has responded to these tragic figures by enacting tougher drunk driving laws. *Compare* IND.CODE § 9–4–1–54 (1982) *with* IND. CODE § 9–11–1–1 to 9–11–4–15 (Supp. 1983). Our supreme court, in upholding the constitutionality of the summary license suspension protocol established by the new legislation, has stated "that Indiana's interest in keeping its highways safe by removing drunken drivers from its roads is ... most compelling...." *Ruge v. Kovach,* (1984) Ind., 467 N.E.2d 673, 681. Citizens' groups such as Mothers Against Drunk Driving and Students Against Drunk Driving have been formed nationally and locally to exert pressure, both on legislative bodies and on peer groups, to recognize and

respond to the problem. Suffice to say that the public concern purportedly served by the roadblock seizure in question is very grave indeed.

■ The second element in the *Brown* test is the degree to which the seizure advances the public concern involved. Here, some of the factors noted by the Supreme Court of Kansas in *State v. Deskins, supra,* become relevant, including the location designated for the roadblock, the availability of less intrusive methods for combatting the problem, the degree of effectiveness of the procedure, and advance notice to the public at large.

■ The interrelationship between two of these factors—the location and effectiveness of the roadblock—was explained in a recent law review note on this topic:

"DWI roadblocks may achieve none of these state interests [deterring and apprehending drunk drivers in the least intrusive manner], however, if they are located in areas that are not frequented by drunk drivers. The lack of empirical basis for the conduct of a DWI roadblock may negate the purported state interest in conducting roadblock seizures as a means of DWI enforcement. [Footnote omitted.]"

Note, *supra,* 71 GEORGETOWN L.J. at 1472.

At the hearing on defendant's motion to suppress, Indiana State Police Squad Sargeant John Lee testified it was his decision to locate this roadblock on State Road 43 at the entrance to the Soldiers Home and this decision was based on his knowledge and experience from 16½ years as a state police officer. Sgt. Lee said he was familiar with and had considered "studies" which were "an accumulation of accidents that have occurred maybe on that road over a given period of time, which could be a year." (R. 65) Sgt. Lee could not say, however, what years these studies involved nor the number of accidents nor the surrounding circumstances of the accidents detailed in the studies. He did state that he was aware of one multiple-fatality, alcohol-related accident on the stretch of road during the preceding two years.

Regarding the degree of effectiveness of the roadblock in this case, Sgt. Lee testified that all 115 cars were stopped that arrived at the roadblock during the 60 minutes of its operation, resulting in three drunk driving arrests, one arrest for driving with a suspended license, and 14 written warnings for non-moving violations, such as driving with an expired license.[6]

■ The state, however, presented absolutely no evidence regarding the availability of less intrusive methods of law enforcement for combatting the drunk driving problem. The traditional method for enforcing drunk-driving laws is for police officers to observe the driving behavior of a particular motorist and watch for indications that the motorist is intoxicated. No doubt, police officers are well trained to identify such indicators as weaving between lanes, failing to signal a turn, speeding, etc. Once such behavior is identified, a police officer would have a reasonable suspicion, i.e. specific and articulable facts indicating that the driver was driving while intoxicated, justifying an investigatory stop. *Delaware v. Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. At the hearing on the motion to suppress, there was no evidence of the inadequacy of the traditional method of enforcing DWI laws, nor of the superiority of the roadblock method of identifying and apprehending drunk drivers. In short, the record fails to demonstrate that the more intrusive roadblock method advances the public interest in removing drunk drivers from the road to any greater degree than the less intrusive traditional method.[7]

---

6. Sgt. Lee also testified that he supervised a total of eight to ten roadblocks in Tippecanoe County during September, 1982. Each roadblock lasted for one hour, and the total number of cars stopped ranged from 90 to 150. Some of these roadblocks resulted in no drunk-driving arrests, while one conducted in Lafayette garnered five such arrests.

7. We do not, of course, prefer that police wait to seize the drunk driver "as the wreckage is being

*See People v. Bartley, supra; State ex rel. Ekstrom v. Justice Court, supra; cf. Delaware v. Prouse, supra.*

■ We recognize, however, that one advantage of the roadblock method over traditional methods of DWI law enforcement is the potential deterrent effect that roadblocks might have on those who would drink and drive. *See State ex rel. Ekstrom v. Justice Court,* 663 P.2d at 998–1001 (Feldman, J., concurring). Those who are drinking away from home are more likely to moderate their liquor consumption if they respect the possibility of encountering a roadblock on their way home. This deterrent effect will operate, however, only where drinking drivers have advance warning that roadblocks might be encountered. While we do not suggest police should announce the precise time and location of each roadblock in advance, nothing in the record suggests that advance notice was given to the public at large of this roadblock or any roadblock for even a general period of time in a general area. Thus, the potential deterrence factor in advancing the public interest against drunk driving is not present in this case.

■ In summary of the government interest side of the *Brown* balancing test, we find that, although the gravity of the public interest served by the roadblock seizure—identifying and apprehending drunk drivers—is enormous, the state presented no evidence that the roadblock procedure advanced this public interest to any degree greater than would have been accomplished by more traditional, less intrusive methods based on individualized suspicion. In addition, Sgt. Lee was unable to articulate much specific, empirical data that guided his knowledge and experience in determining that this particular location for the

roadblock would be fruitful in achieving the purpose for which the roadblock was established. Although three drunk-driving arrests in one hour are not to be taken lightly, since they represent the prevention of three potential tragedies, we simply have nothing with which we can compare that number in determining the degree to which this roadblock procedure advanced the public interest. The burden was on the state to prove the public interest was advanced to *some* degree. *Lance v. State, supra; Bruce v. State, supra.*

Turning now to the third and final element of the *Brown* test, the severity of interference with individual liberty entailed by the seizure, we recall the distinction between objective and subjective intrusion on fourth amendment interests, *see Martinez-Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083, and examine these separately.

■ The objective intrusion on fourth amendment privacy and liberty interests occassioned by this roadblock procedure was relatively minor. According to Sgt. Lee's testimony, the average length of time each driver was stopped was two to three minutes. Each was asked to produce his driver's license and vehicle registration, but no further questioning took place "unless there was something else suspicious involved.... Like maybe I could detect an odor of alcohol or he had trouble locating his driver's license or his registration, then I would inquire a bit further and go from that point." (R. 53–54) Upon reasonable suspicion that the driver was intoxicated, the detaining officer would direct the driver to the side of the road for further questioning. The visual inspection of each car and driver appears to have been limited to the observations the detaining officer could make without a search, *see Martinez-*

towed away." *Delaware v. Prouse,* 440 U.S. at 666, 99 S.Ct. 1402 (Rehnquist, J., dissenting). We simply note that, to an even greater extent than those involved in smuggling illegal aliens, *see Brignoni-Ponce, supra,* or those driving without a license, *see Delaware v. Prouse, supra,* the drunk driver tends to generate articulable suspicion by his poor driving performance. Realizing that police officers cannot be everywhere at

once, we are yet without information whether the concentration of seven police officers for one hour at this roadblock on an out-of-town road is a more effective means of identifying and apprehending drunk drivers than having those officers patrol roads nearer the places where drivers are likely to be drinking. The record fails to inform us on this matter.

*Fuerte, supra,* although given the nighttime hour of the stop and Officer Jozwiak's testimony that he observed that defendant's eyes were bloodshot, it is likely the detaining officer shined a flashlight into each driver's face.

The question of the subjective intrusion on motorists' fourth amendment liberty interests caused by this roadblock procedure may be analyzed at two levels. The first is the degree to which the physical characteristics of the roadblock tended to generate anxiety or fright within the motorists subjected to the roadblock seizure. Relevant here are the factors of location, time and duration of the roadblock, the advance warning to individual approaching motorists, the maintenance of safety conditions, and the average length of time each motorist was detained.

 As mentioned above, the average detention lasted two to three minutes. The roadblock was located on a flat, straight stretch of State Road 43, near the entrance to the Soldiers Home. The roadblock was conducted between 10:30 and 11:30 P.M. on Saturday, September 4, 1983. An approaching motorist would be alerted a quarter-mile before the roadblock that something out of the ordinary was occurring by flares set in the middle of the road and by police cars on either side of the road with their rear deck warning lights flashing. As he approached closely enough, the driver might see other motorists stopped, and, eventually, he would receive a signal to stop from one of the seven officers on hand. Nevertheless, no warning signs were posted to inform the approaching motorists of the fact or the purpose of the roadblock, and it is not clear that detainees were ever informed of the precise purpose of the roadblock. At the point where the officers were located, the road was wide enough to allow a safe place for further investigation of drivers suspected of a violation of the law, but the record does not disclose whether the lighting in the area, beyond that provided by the burning flares, was adequate to ensure the safety of police officers and detained motorists. In addi-

tion, it appears that an individual approaching motorist could "see visible signs of the officers' authority," *Martinez-Fuerte,* 428 U.S. at 558, 96 S.Ct. 3083, in that there were seven police officers and an equal number of police cars at the roadblock site, sufficient to inform the driver of the lawful authority conducting the roadblock. Thus, on the whole, the subjective intrusion caused by the *physical characteristics* of the roadblock in question was relatively minor, although better practice might dictate warning signs and some method of informing the motorists of the purpose of the stop, so that they might better know what to expect.

The second level at which the subjective intrusion on fourth amendment interests must be analyzed involves the degree of discretion left to the officers in the field, who actually conducted the roadblock. The discretion factor, in turn, operates on two planes—perceived and actual discretion. If an individual motorist perceives that an individual police officer has the unfettered discretion to stop whomever he pleases, the motorist is more likely to feel anxious at the prospect of being singled out personally. The perceived level of discretion in this case should have been nil, since every car that arrived at the roadblock site was stopped.

 The actual level of discretion left to the officers executing the seizures at a roadblock can be a factor of overriding importance, as indicated by *Delaware v. Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. And, as *Brown v. Texas, supra,* indicated, to the end that field officers' discretion be controlled, the fourth amendment requires that a particular seizure be based on individualized suspicion or "be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." 443 U.S. at 51, 99 S.Ct. at 2640. It was upon the absence of such "previously specified neutral criteria" that the trial court granted defendant's motion to suppress. *See supra* at 1129–1130.

Sgt. Lee testified at the hearing on the motion to suppress that in August, 1982,

State Police General Headquarters in Indianapolis circulated a memorandum to State Police posts throughout the state, telling the commander at each post to begin setting up roadblocks, at locations to be determined at the local level, for the purpose of detecting and apprehending drunk drivers. The commander at the Lafayette post, Lieutenant Rabanus, assigned Sgt. Lee, a squad sargeant with responsibilities of supervision over "a number" of troopers, to set up the roadblock operations. Sargeant Lee had complete discretion to decide the location, duration and frequency of the roadblocks, but in other matters of the actual conduct of the roadblock—such as which cars to stop, how to conduct the questioning of drivers, and how to handle those suspected of violating the law—Sgt. Lee was ordered to follow a set of guidelines given to him by Lt. Rabanus. These guidelines are contained in a document included as an appendix to this opinion. *See infra* at 1142–43. The document purports to be a "case highlight" of the United States Supreme Court's decision in *Delaware v. Prouse*, written by the Marion County Prosecutor's Office. Even a cursory comparison of this document to the *Prouse* opinion will reveal, however, that it bears almost no relation to the opinion of the Supreme Court. It appears to be, rather, the Marion County Prosecutor's Office's idea of how a reasonable roadblock should be operated. Nevertheless, the uncontradicted testimony of Sgt. Lee supports the inference that State Police Headquarters adopted this document as the standard by which the roadblocks they had decided to initiate would be operated.

Three questions arise at this point: (1) In light of Officer Jozwiak's testimony that he had not read these guidelines prior to his participation in the roadblock and that he acted instead on Sgt. Lee's oral instructions, can it be said these guidelines actually operated to control the discretion of the officers in the field? (2) What is the effect of the failure of the guidelines to guide Sgt. Lee's discretion in determining the location, time, duration and frequency of roadblock operations? (3) What is the significance of Sgt. Lee's direct participation in the conduct of this roadblock? *See People v. Scott*, (1983) 122 Misc.2d 731, 471 N.Y.S.2d 964, 967 ("[The] direct participation by high level administrative personnel, charged with assuring that field officers comply with the guidelines, is a factor to be weighed in determining whether a genuine standard exists to protect the public.")

These questions are best answered if we remind ourselves that it is the constitutionality of *this* seizure with which we are concerned, and in *this* case, it does not appear that whatever discretion was left to Sgt. Lee or the officers in the field was abused in any way. First, acting on Sgt. Lee's instructions, the field officers stopped every car that arrived at the roadblock, made secondary investigations at the roadside only when reasonable suspicion of drunk driving was aroused, and in short, did not arbitrarily invade the reasonable expectations of privacy of one motorist any more than another's. *See Brown v. Texas*, 443 U.S. at 51, 99 S.Ct. at 2640. That is, all drivers who arrived at the roadblock were treated the same unless the detaining officers had reasonable grounds to treat them otherwise. Secondly, although Sgt. Lee had the discretion to locate the roadblock "any place in the state of Indiana" (R. 68), and although there is no empirical data in the record to indicate this location could have been expected to be especially fruitful in apprehending drunk drivers, nevertheless it does not appear he abused this discretion by locating the roadblock "where it [bore] arbitrarily or oppressively on motorists as a class." *Martinez-Fuerte*, 428 U.S. at 559, 96 S.Ct. at 3083. Thirdly, as the court in *People v. Scott, supra*, recognized, where the administrative officer, who was charged with assuring the field officers complied with the guidelines, has not been shown to have abused his discretion or deviated from the guidelines, his direct participation in the roadblock alone does not militate against its reasonableness under the fourth amendment. *See* 471 N.Y.S.2d at 967.

In summary of the private interest side of the *Brown* test, we find the objective intrusion on the detained motorists' fourth amendment rights was relatively low; the subjective intrusion caused by the physical characteristics of this roadblock was somewhat higher, due to its isolated location, questionable lighting, and absence of warning signs; and the perceived and actual discretion left to the officers in the field was adequately controlled by the guidelines provided to Sgt. Lee and Sgt. Lee's oral instructions to his field officers.[8]

■ Thus, we are left with a very close case. Despite the gravity of the public concern for identifying and apprehending drunk drivers and the moderately low level of interference with individual liberty occasioned by the roadblock procedure, the state failed to present any evidence that the roadblock procedure advanced the public interest to a greater degree than would have been achieved by traditional methods of drunk-driving law enforcement, which are to be preferred because they are based

upon a requirement of individualized suspicion. *See Brown v. Texas, supra; Delaware v. Prouse, supra; Terry v. Ohio, supra.* The state, no doubt, had the relevant evidence available to it, having conducted eight to ten roadblocks in Tippecanoe County alone in September, 1982, and having other records to show the effectiveness of traditional methods of enforcing drunk driving laws.

■ Recognizing that the roadblock procedure here at issue, in which the culpable and innocent alike were subject to seizure by law enforcement agents, lies at the very fringe of the fourth amendment, we are unwilling to validate this procedure absent some evidence that it is necessary, or at least more effective than available methods of drunk driving law enforcement, which are based on individualized suspicion aroused by observed conduct.[9] Therefore, we hold that the state failed to meet its burden of proving the reasonableness of the warrantless seizure of defendant under

---

8. Contrary to the trial court, we find the written guidelines here in question, *see Appendix, infra* at 1142–43, sufficient to qualify as "previously specified neutral criteria." Although not originated by the Indiana State Police, there was sufficient, uncontradicted evidence from Sgt. Lee to indicate State Police Headquarters adopted the "Case Summary" as its guidelines for roadblock operations. Moreover, these guidelines cover every aspect of the roadblock procedure from the initial seizure forward, and, if followed, would adequately control the discretion of officers in the field. Finally, those aspects of roadblock procedure not covered by the guidelines, such as location, time, duration and frequency, are "factors that are not susceptible to the distortions of hindsight, and therefore will be open to post-stop review ...." *Martinez-Fuerte,* 428 U.S. at 565, 96 S.Ct. at 3086.

9. *See State ex rel. Ekstrom v. Justice Court,* (1983) 136 Az. 1, 663 P.2d 992; *People v. Bartley,* (1984) 125 Ill.App.3d 575, 80 Ill.Dec. 894, 466 N.E.2d 346. Although both of these decisions relied to some extent on other facts, both also relied on the absence of evidence by the state showing the need for or effectiveness of the roadblock procedure. In *Ekstrom,* the Supreme Court of Arizona stated:

"In the past, the foremost method of enforcing the DWI laws has been by observing how the person drives. The state has stipulated that 'DPS officials, by observing and patrol-

ling, regularly arrest drivers for DWI when there are no roadblocks. DPS officers are trained to detect drunk drivers on the road on the basis of observation. An experienced DPS officer becomes highly skilled at detecting drunk drivers by watching how a person drives. Without roadblocks, an experienced DPS officer can detect many drunk drivers.'

By the foregoing quotation, we see that the state has in effect stipulated itself out of court. If there is an adequate method of enforcing the drunk driving statute, there is no pressing need for the use of an intrusive roadblock device. We have no empirical data in the record before us with which to weigh the reasonableness of the roadblock intrusion upon individual rights against the needs of the state."

663 P.2d at 996. Similarly, the Appellate Court of Illinois, in *Bartley,* stated:

"In applying the second factor [of the balancing test stated in *Brown v. Texas*] to this case, we find that the State has failed to demonstrate the superiority of a roadblock over these less intrusive alternative means of deterrence. There is nothing in the record which shows that the only practical or effective means of catching drunk drivers is by arbitrarily subjecting all citizens to police scrutiny without suspicion of wrongdoing simply because they happen to be traveling on a particular road at a certain time."

466 N.E.2d at 348.

the fourth amendment standard announced by the United States Supreme Court in *Brown v. Texas, supra,* and so, we affirm the trial court's ruling that the fruits of that seizure must be suppressed.

 We wish to reiterate that, as is our duty, we rule only upon the reasonableness of the seizure of this defendant at this roadblock. In another case, assuming the public interest and private intrusion factors were as they are in the present case, a proper showing by the state that the roadblock method is more effective than traditional methods of drunk driving law enforcement might tip the balance in favor of the reasonableness of the roadblock procedure. Regarding the deterrent effect presumably generated by advance publicity of the use of a DWI roadblock in a general location over a given period of time, *see State ex rel. Ekstrom v. Justice Court,* 663 P.2d at 998–1001 (Feldman, J., concurring) we note that concern should be given to the fact that the same effect might be generated by advance publicity of a concentrated effort by police officers using traditional methods of DWI law enforcement. Thus, the deterrent qualities of a publicized DWI roadblock would not, standing alone, render that procedure reasonable under the fourth amendment balancing test enunciated in *Brown v. Texas.*

Affirmed.

CONOVER and YOUNG, JJ., concur.

APPENDIX

# Prosecutor's Review

(This is a monthly publication of the Marion County Prosecutor's Office which will cover various topics of interest to law enforcement officers.)

## Case Highlights

**Case:** Delaware v Prouse (1979) 440 U.S. 658

**Subject:** Roadblocks to check for Traffic Violations

> PROSECUTOR'S
> EXHIBIT
> I

**Analysis:** The United States Supreme Court has determined that roadblocks may be used to stop traffic to check for violations. While a procedure of random stops of motorists to check for violations is impermissible under the Fourth Amendment, a procedure employing systematic stops to detect violations is permitted.

A. Systematic Stops. Roadblocks must be conducted in a systematic manner. It is not necessary to stop every vehicle. For example, officers may stop each vehicle until traffic backs up to a pre-determined point, then suspend the stops until traffic clears. Officers may decide to stop every third vehicle, or all vehicles approaching for a pre-determined length of time. The important point is that the stops are made in accordance with a pre-determined system.

B. Brief Questioning Roadblock stops should be as reasonable and unobtrusive as possible. The officer may:

Request the driver to produce his license and registration; ask if the driver has been drinking; and if so, how much; ask appropriate questions concerning vehicle equipment violations; observe any objects inside the vehicle that are in plain view.

C. Further Investigation After a Stop. Unless there are specific reasons to justify further detention, the motorist should be permitted to continue on after the brief questioning and checking for traffic violations. Where the officer learns that the driver is in violation of license or registration requirements or a vehicle equipment requirement, the motorist may be detained for time sufficient to issue a complaint and summons for the violation.

Where the officer has probable cause to believe the driver is intoxicated (odor of alcohol, slurred speech, demeanor, balance, etc.) the officer may detain the driver, offer a chemical test under the implied consent law, and arrest the driver if he fails or refuses the test.

## APPENDIX—Continued

Where the officer observes suspected contraband items or a firearm in plain view at the roadblock stop, he may investigate further and make an arrest if the driver has no license for a handgun, or if the suspected items are contraband. (Drugs, sawed-off shotguns, minor in possession of alcohol.)

D. Searches. If a custodial arrest is made, the officer may search the individual and the entire passenger compartment for weapons incident to the arrest. Any articles discovered during such searches may give probable cause to arrest on other offenses.

E. Evading a Roadblock. If the officer has identified himself by visible or audible means and directed the motorist to stop, a motorist who knowingly flees may be arrested for Resisting Law Enforcement. If the motorist is arrested for Resisting, a search of the individual and passenger compartment incident to that arrest is authorized.

STATE'S
EXHIBIT NO. 1

DIRECT: Lee.