202 N.J. Super. 28 (1985)
493 A.2d 1271
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
FRANCIS R. KIRK, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 1985.
Decided May 28, 1985.
*31 Before Judges KING, DEIGHAN and BILDER.
*32 Dennis J. Quinn, argued the cause for appellant.
Albert I. Telsey, Assistant Prosecutor, argued the cause for respondent (John Corino, Cape May County Prosecutor, attorney).
Boris Moczula, Deputy Attorney General, argued the cause amicus curiae (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by KING, P.J.A.D.
The issue here is the constitutionality of a road block or vehicle check point set up by two State Troopers on a county highway in a rural area of Cape May County at about 5:30 p.m. on Saturday, October 15, 1983. The Law Division judge denied the defendant's motion to suppress the evidence against him on the charge of drunken driving. All of the evidence against defendant was the product of the stop which was made without any probable cause or particularized suspicion of illegal activity. Defendant contends that the stop was a violation of his constitutional rights.
After denial of the motion to suppress, defendant pled guilty to driving while under the influence of alcohol, N.J.S.A. 39:4-50, was fined $250, and his license to drive was revoked for six months. No stay of the license revocation was sought and defendant has suffered that aspect of the penalty. He now appeals under R. 3:5-7(d) which preserves his right, despite the guilty plea, to appellate review of the validity of the stop and seizure of his person which he claims violated his constitutional rights.
Trooper Mayes was the only witness at the hearing on the motion to suppress. He described his duties on October 15, 1983 as "general traffic  any traffic enforcement." He and Trooper Martinez decided to stop all traffic in both directions on County Route 550 in Dennis Township, Cape May County. This *33 is a two-lane road in a rural area, lightly travelled, especially at this time of year. He described his purpose as follows
What we do is we set up. At that time it was only two Troopers me and another trooper, we take both lanes north and south bound in this instance and stop every car that comes down the road asking for driver's license, registration, insurance card and at this time we also check for any equipment violation such as bald tires and such, anybody who appears to be intoxicated and any drugs, anything in plain view of such sort.
The Trooper said he picked this road because it was less traveled than a main road. This was necessary because they planned to stop all cars. He said that "you have to keep in consideration the volume of traffic on these roadways" and "we can't go on any major highways because you have traffic buildup so much that we pick a side road that is not so heavily travelled." On Route 550, the troopers would usually have no more than five cars stopped going in each direction at the same time during a road block. The first car stopped was defendant's; this was about ten minutes after the road block was set up. Immediately after defendant was arrested on suspicion of drunken driving the road block was broken down and defendant was taken to the barracks for booking. A single trooper could not operate the check point because of safety and security considerations. Only defendant Kirk and one other car had been stopped before the road block was closed down. As noted, there was no probable cause to stop defendant Kirk's vehicle. The facts supporting the trooper's decision to charge him were gleaned only after he was stopped, questioned, and given roadside tests to perform.
Trooper Mayes himself selected the place on the highway where all vehicles would be intercepted. He gave no reason or justification for the particular location. When asked: "How often do you set up these traffic checks?" the trooper replied: "There's no specific, you know, amount." He then said the determinative factor was "mostly the weather, really ... we don't have traffic checks in downpours." He added that they were not set up on every clear day. When asked: "What determines in your mind when you're going to set up a traffic *34 check?", he replied: "Basically we [he and his partner trooper] just discuss it and we'll have one."
No flares or warning signs were used. There was no advance publicity given. The intercepting trooper simply stood in the middle of the road and waved down all cars from both directions. The trooper also expressed his reliance on New Jersey State Police Official Training Bulletin # 1-79[1], May 10, 1979, which contained a summary of the United States Supreme Court's opinion in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), prohibiting random stops, and an admonition to troopers to either stop every vehicle, or stop vehicles at a uniform rate, i.e., every fifth, tenth or fifteenth vehicle, when conducting a road block.

I
We wish to be clear that our decision is rendered on State constitutional grounds exclusively, not on federal constitutional grounds. In compliance with the admonition of Justice O'Connor in Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201, 1214 (1983), we rely on federal precedents for guidance as we would on precedents of any other jurisdiction, not because of any concept of federal constitutional compulsion. Ibid. We intend that our decision rest on "bona fide separate, adequate, and independent State grounds," not subject to federal review. Ibid. As Justice O'Connor noted in Long: "It is *35 fundamental that State courts be left free and unfettered by us in interpreting their state constitutions." Ibid.
Art. I, par. 7 of the New Jersey Constitution of 1947[2] is almost identical in wording to the Fourth Amendment to the federal Constitution.[3] Under our recent cases, we are free to look to our Constitution which on at least four occasions has been construed to afford greater protection to privacy interests than the parallel provision of the federal constitution. See State v. Hunt, 91 N.J. 338 (1982) (protectible interest in toll billing records); State v. Alston, 88 N.J. 211 (1981) (standing to challenge search and seizure); State v. Johnson, 68 N.J. 349 (1975) (consent to search); State v. Novembrino, 200 N.J. Super. 229 (App.Div. 1985) (no "good faith" exception to exclusionary rule). Indeed, the United States Supreme Court itself has invited the several states to develop acceptable alternatives to the constitutionally infirm random traffic stop condemned in the leading federal case, Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979): "This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion."
Structural differences in the State and federal constitutions, and matters of particular state interest or local concern, are two of the factors to be considered in developing an independent body of state constitutional law. See Justice Handler's *36 concurring opinion in State v. Hunt, 91 N.J. 338, 365-366 (1982). See also his opinion in State v. Williams, 93 N.J. 39 (1983). See generally Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv.L.Rev. 489 (1977); "Developments In the Law  Interpretation of State Constitutional Rights," 95 Harv.L.Rev. 1324, 1361 (1982); Pollock, "State Constitutions as Separate Sources of Fundamental Rights", 35 Rut.L.Rev. 707 (1983); Note, Fernandez, The New Jersey Supreme Court's Interpretation and Application of the State Constitution, 15 Rut.L.J. 491 (1984). We conclude, as have many other state courts, that our State Constitution, which serves only "to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives," Hunt at 365, is a more appropriate vehicle to resolve questions concerning the rights of our citizens to travel the highways of our state without police interdiction and the rights of the police to use reasonable methods to enforce our traffic laws than is the federal constitution. As the United States Supreme Court recognized in Delaware v. Prouse, this is an essentially local, not a federal concern, subject of course to the constitutionally minimum federal standards established by Delaware v. Prouse and its antecedents.

II
This case is one of first appellate impression in New Jersey. One Law Division opinion has approved a sobriety road block in State v. Coccomo, 177 N.J. Super. 575 (Law Div. 1979), a case widely cited in other jurisdictions' discussions of this problem[4]. The contrast of the facts in Coccomo to the facts before us are instructive in illustrating why we conclude that the road block in the present case rests so much upon the discretion of the *37 officers in the field that it is unconstitutional. See infra at 40.
As Justice Clifford said in State v. Carpentieri, 82 N.J. 546, 548 (1980):
There is, of course, no question that Prouse effected a radical departure from the state of our law as it existed up until the date of that decision, for until then such random stops were expressly authorized under case law in New Jersey, see State v. Gray, 59 N.J. 563, 567 (1971); State v. Braxton, 57 N.J. 286, 287 (1970); State v. Kabayama, 98 N.J. Super. 85, 87-88 (App.Div. 1967), aff'd o.b. 52 N.J. 507 (1968), and at least inferentially under our statutory law, see N.J.S.A. 39:3-29.
See also State v. Gervasio, 94 N.J. 23, 24, 31 (1983), where Justice Handler observed, "a large majority of jurisdictions approved of random [investigatory] stops prior to the Supreme Court's decision in Prouse." Id. at 30.
Our survey of Prouse, its federal antecedents, United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), and United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and its successor, Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), and our consideration of the decisions of our sister states, leads us to the conclusion that the road block in this case was violative of our State constitutional provision against unreasonable seizure. We conclude that the road block used in this case is really not distinguishable from the random investigatory stop condemned in Prouse. This temporary road block was set up by the exercise of absolute, unbridled discretion of the officers in the field. There was no command or supervisory participation involved. There were no limits or directions of any kind on the "when, where and how" of this road block, and no hint as to any particular "why." There was no demonstration of need or efficacy at this particular time and place. We get the distinct impression that the purpose was little more than to give the officers something to do on the particular occasion. To quote Justice White, the practical effect of the system used here was to leave the traveller "subject to the discretion of the official in the field." Camara v. Municipal *38 Court, 387 U.S. 523, 532, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967) (constitutional right to insist that building inspectors obtain administrative search warrant).
In Delaware v. Prouse the Supreme Court held that random investigatory stops of motor vehicles made without probable cause or reasonable suspicion were unconstitutional. The Court granted certiorari apparently because five jurisdictions thought the Fourth Amendment permitted such stops but six thought to the contrary, 440 U.S. at 651, 99 S.Ct. at 1391. The Fourth and Fourteenth Amendments were implicated "because stopping an automobile and detaining its occupants constitute[d] a `seizure' within the meaning of these Amendments", 440 U.S. at 653, 99 S.Ct. at 1395, citing Martinez-Fuerte, Brignoni-Ponce, and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Prouse Court thought the essential purpose of the Fourth Amendment was to impose a standard of reasonableness upon law enforcement agents in order to safeguard the privacy and security of individuals. The Court stressed that in situations where the balance between intrusion on individual rights against the promotion of some legitimate governmental interests precluded insistence on some quantum of individualized suspicion, other safeguards are generally used to assure that reasonable privacy expectations are not subject to the whim or discretion of the official in the field. 440 U.S. at 654, 99 S.Ct. at 1396. In Prouse, Justice White alluded to the ruling in Brignoni-Ponce holding unconstitutional random stops by roving immigration patrols, stops not based on any individualized suspicion. This was in contrast to the approval of fixed road blocks strategically placed to uncover illegal immigrants approved in Martinez-Fuerte. Indeed the very question before us today, which may be fairly characterized as the "constitutionality of the roving road block", seemed to have been left open by the federal high Court in Martinez-Fuerte at least until Prouse. See 440 U.S. at 656 n. 13, 99 S.Ct. at 1397 n. 13 (judgment reserved on the permissibility of state and local road blocks for documents and credentials).
*39 Prouse stressed that the unconstitutional aspect of roving patrols and random stops operating without probable cause or reasonable suspicion was "the unbridled discretion of law enforcement officials." Thus "standardless and unconstrainted discretion" was the "evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." 440 U.S. at 661, 99 S.Ct. at 1400. The "grave danger of abuse of discretion" required that regulatory inspections be undertaken pursuant to reasonably established "neutral criteria." Id. at 662, 99 S.Ct. at 1400. Justice White concluded in Prouse that
An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry v. Ohio, supra, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles. See Adams v. Williams, 407 U.S. 143, 146, 32 L.Ed.2d 612, 92 S.Ct. 1921 (1972). [Id. at 662-663, 99 S.Ct. at 1400-1401].
The Court then concluded the Prouse opinion by stating: "Questioning of all oncoming traffic at road block-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." Id. at 663, 99 S.Ct. at 1401 [emphasis supplied].
Several months after Delaware v. Prouse was decided a unanimous Supreme Court reaffirmed the principles there expressed in Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed. 2d 357 (1979), a case where police officers unlawfully detained a pedestrian on criminal charges simply because he refused to *40 identify himself. The operative federal constitutional principle was summarized by Chief Justice Burger.
A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. See Delaware v. Prouse, 440 U.S. 648, 654-655, 59 L.Ed.2d 660, 99 S.Ct. 139 (1979); United States v. Brignoni-Ponce, supra [422 U.S.] at 882, 54 L.Ed.2d 607, 95 S.Ct. 2574. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. Delaware v. Prouse, supra [440 U.S.] at 663, 59 L.Ed.2d 660, 99 S.Ct. 1391 [at 1401]. See United States v. Martinez-Fuerte, 428 U.S. 543, 558-562, 49 L.Ed.2d 1116, 96 S.Ct. 3074 [3083-3085] (1976). [443 U.S. at 51 [99 S.Ct. at 2640].
The arrest in Brown v. Texas was invalid because "the appellant's activity was no different from the activity of other pedestrians in that neighborhood." Id. at 52, 99 S.Ct. at 2641. The sole reason the officer stopped appellant, walking in an area frequented by drug users, was to ascertain his identity. The Chief Justice said "[t]he record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees." Ibid.
Then the debate began among the states and some federal courts as to the constitutionality of road blocks, particularly those designed to inhibit drunken driving, see generally Note, "Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock seizures," 71 Geo.L.J. 1457 (1983); see also Note, "The Prouse Dicta: From Random Stops to Sobriety Checkpoints", 20 Idaho L.Rev. 127 (1984); Comment, "Sobriety Checkpoints Roadblocks: Constitutional in light of Delaware v. Prouse", 28 S. Louis U.L.J. 813 (1984). Inevitably, two lines of cases developed  one line approving road blocks and one disapproving them. A review of the cases tends to suggest common themes. If the road block was established by a command or supervisory authority and was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law *41 enforcement goals, the road block will likely pass constitutional muster. Other factors which enhanced judicial approval were (1) adequate warnings to avoid frightening the traveling public, (2) advance general publicity designed to deter drunken drivers from getting in cars in the first place, and (3) officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers. Simply sending out officers to set up road blocks when and where they felt like it, without any command participation as to site, time and duration, and not based on articulated and rational law enforcement needs which justified the balance in favor of intrusion and outweighed the privacy right of the citizen to travel unimpeded, is a technique which has not survived constitutional scrutiny very well.
New Jersey's sole opinion on the subject is State v. Coccomo, 177 N.J. Super. 575 (Law Div. 1980), an oft-cited, post-Delaware v. Prouse trial court opinion which provides a sharp contrast with the road block procedures challenged in the case before us. In Coccomo the road block was set up at 1:30 a.m. on Saturday, April 5, 1980 by a detail of Roxbury Township police on Main Road, pursuant to the Chief of Police's written departmental policy. The purpose of the road block was to check for the sobriety of drivers, and for drivers' licenses, registrations and insurance cards (N.J.S.A. 39:3-29). Every fifth vehicle was stopped. At about 2:55 a.m. defendant's vehicle was stopped. Only after the stop did the police gain evidence to support the drunken-driving charge. The judge recognized the State's indisputable vital interest in promoting public safety by detecting and prosecuting drunk drivers. Id. at 582. He also recognized that "whether the practice adopted in Roxbury Township is reasonable depends upon a balancing of the State's interest in promoting highway safety against the individual motorist's interests in his expectations of privacy." Ibid.
The judge found from the evidence that the Roxbury program was "sufficiently productive to qualify as a reasonable law enforcement practice." Ibid. The road-block detail, with a captain in charge, was strategically located during the early *42 morning hours of the weekend on Main Road near a resort area "where many bars are located" and which connected with U.S. Route 46. Seven fatal auto accidents had occurred on this road during the two years before road blocks were used and most involved alcohol abuse by the driver; "numerous" drunk-driving arrests had resulted from this road block program.
The road blocks were used only in early morning hours coinciding with "closing hours of local taverns." The location was fixed throughout the night in use, marked by flares, and "specific, defined standards" implemented in accordance with a "written policy of the Roxbury Township police department," id. at 579, were followed. The judge found that neither the State nor the federal constitution was offended by the Roxbury program and that the police had "simply adjusted their systems and procedures to accommodate evolving concepts of constitutional law." Id. at 584. The road block in Coccomo was not a discretionary undertaking by subordinates in the field, established at whim for no detectable purpose other than to "pull people over" to see if something turned up. It was carefully set up for a demonstrably rational purpose and the "actual manner of stopping vehicles [was] designed both to promote safety and reduce anxiety on the part of motorists." Id. at 583.
The most comprehensive and thoughtful discussion on this subject is found in 3 LaFave, Search and Seizure, 10.8(g) at 188 (Supp. 1985). Professor LaFave has added subsection (g), entitled "Sobriety Check point," to his treatise in this year's supplement. During the course of his discussion of the extant authorities, he treats the issue of selection of the time and place for the interception of traffic without individualized suspicion to investigate for drunken driving. LaFave comments that "several basic features of the road block stop are identifiable." Ibid. at 189. He states that
The site of the roadblock and the time of its operation are usually determined by administrative officers in the law enforcement department of the jurisdiction. These officers decide where and when to locate a DWI roadblock based on empirical data indicating that drunk drivers pose a particular problem at the *43 respective location and time. [Citing Note, 71 Geo.L.J. 1457, 1461, n. 20, 21 (1983)].
Our research confirms LaFave's conclusion that participation of command or supervisory authority in selecting the time and place based on reasonable evidence of social utility is an essential constitutional ingredient and necessary to satisfy the objection that the traveller not be "subject to the discretion of the official in the field." Camara v. Municipal Court, 387 U.S. at 532, 87 S.Ct. at 1732. We also agree with LaFave that it is "fair to conclude that a DWI road block is constitutional if properly conducted." LaFave, § 10.8(g) at 190 (Supp. 1985). LaFave recognizes the strong public interest in combatting drunken driving and the mixed success from more conventional means of law enforcement, such as routine patrols, id. at 190-192, noting that "success" of the road-block technique should encompass not only successful apprehensions but also the realization that substantial deterrence may be gained from generalized advance publicity of road blocks. Id. at 193.
But against this public interest LaFave cautions that we must weigh the Fourth Amendment and privacy interests which "would be intruded upon or threatened." Id. at 193.
Most relevant in this respect is the Supreme Court's explanation in Martinez-Fuerte of why the roadblock at issue there was not unduly intrusive:
First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review. [428 U.S. at 559, 96 S.Ct. at 3083].

*44 Certainly one very strong theme which runs through that statement is that a police procedure is less threatening to Fourth Amendment values when the discretionary authority of the police (and thus the risk of arbitrary action) is kept at an absolute minimum. Such was deemed to be the case in Martinez-Fuerte both as to the initial location of the checkpoint  which was fixed and was determined by supervisory officers  and as to the selection of vehicles to be subjected to the roadblock.
LaFave also points up the unsoundness of the view that sobriety checkpoints must be permanent, id. at 194 n. 186, and we agree. He maintains that "police discretion can be sufficiently limited even as to temporary locations, and thus it is proper to turn our attention to precisely how that must be done." Ibid. LaFave says on this important point of location of temporary or movable road blocks
Quite clearly, the question of where and when a DWI roadblock is to be conducted should not be left to officers in the field. Rather, what is needed is that these roadblocks be "established by [a] plan formulated or approved by executive-level officers of the law enforcement agencies involved" which contains "standards ... with regard to time, place" and similar matters. [Citing State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 663 P.2d [992] (1983) (Freidman, J., concurring), and State v. Olgaard, 248 N.W.2d 392 (Sup.Ct.S.D. 1976)]. This is because "in the absence of record evidence that the decision to establish the roadblock was made by anyone other than the officers in the field, the roadblock in question [has] certain characteristics of a roving patrol," [citing State v. Olgaard, supra], namely, an appreciable risk of an arbitrary basis for the site or time decision. Thus, a failure to have these decisions made by supervisory officials has been a factor stressed by courts in holding a particular sobriety checkpoint illegal, [citing Ekstrom and Olgaard, supra], while other cases upholding these road blocks have placed considerable emphasis upon the fact that a high-level plan determined where they would be put and when they would be operated." [Citing State v. Deskins, 234 Kan. 529, 673 P.2d 1174 (1983); State v. Coccomo, 177 N.J. 525 [Super. 575], 427 A.2d 131 (1980); Commonwealth v. McGeoghegan, 389 Mass. 137, 449 N.E.2d 349 (1983)."
[Id. at 194].
There is no requirement that police obtain a judicial warrant to set up a road block but it is "open to a defendant challenging a sobriety check point to bring into question the validity of the decision as to when and where it would be operated." Id. at 195. LaFave illustrates the point by citing State v. Coccomo, supra, where the challenge as to the location of the checkpoint failed "because it was placed on a road `where many bars are *45 located' and where empirical data revealed that `seven fatal vehicular accidents,' in most of which `alcohol abuse by the driver of a vehicle was a contributing factor,' had occurred in the past two years." Id. at 195.
Several cases published since the appearance of LaFave's 1985 Supplement also continue to demonstrate the points he stresses. State v. McLaughlin, Ind. App., 471 N.E.2d 1125 (Ct.App. 1984), considered a drunken driving road block set up on the Saturday of Labor Day weekend at 11 p.m. by seven uniformed officers equipped with three or four police cruisers. The court, citing Delaware v. Prouse, 440 U.S. at 662, 99 S.Ct. at 1400 considered the constitutionality of the road block on federal Fourth Amendment grounds and held it unconstitutional because it was "not conducted according to administrative guidelines that qualified as `previously specified Neutral Criteria'." 471 N.E.2d at 1130. The Indiana appellate court reviewed the cases we and LaFave have discussed and observed that "since the Prouse decision, some refinements have been made in the analysis of Fourth Amendment seizure cases, both by the United States Supreme Court and by the numerous state courts that have considered road blocks seizures similar to the one presently before us." Id. at 1134. Specifically, the court observed that on the federal side Brown v. Texas, 443 U.S. at 50-51, 99 S.Ct. at 2640, emphasized that seizures must be implemented "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." The court noted, we assume to emphasize the closeness of the entire question, that one survey of state court cases, in which challenges were asserted to road blocks established for the purpose of detecting drivers under the influence as either a primary or secondary purpose, revealed an even split in the decisions, five upholding the road block and five not.[5]
*46 The Indiana appellate court summarized the "numerous conditions and factors which must be considered in deciding whether the road block met the balancing test on the side of the State." These factors, discussed in a leading case, State v. Deskins, 234 Kan. 529, 673 P.2d 1174 (1983), were
(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test. Not all of the factors need to be favorable to the state but all which are applicable to a given roadblock should be considered. Some, of course, such as unbridled discretion of the officer in *47 the field, would run afoul of Prouse regardless of other favorable factors." 673 P.2d at 1184-1185. [471 N.E.2d at 1135-1136].
The Indiana court then held that the state had fallen short of meeting its burden that the warrantless seizure was reasonable in the circumstances. While recognizing that the public concern to be served was "very grave", the court could find no relationship between the location of the road block and any measure of effectiveness of this law enforcement technique. The record failed to demonstrate that this more intrusive method advanced the public interest "to any greater degree than the less intrusive traditional method." 471 N.E.2d at 1137. We must note here that there was more justification for the location of the road block in the McLaughlin case than was offered for the road block in the case before us. Nor was there any generalized advance publicity in McLaughlin geared to deter drunken drivers from driving at all. The Indiana court was also troubled by the discretion left to the officer in the field. The sergeant in charge had the discretion to locate the road block "any place in the State of Indiana." 471 N.E.2d at 1140. The Indiana court concluded as follows.
Thus, we are left with a very close case. Despite the gravity of the public concern for identifying and apprehending drunk drivers and the moderately low level of interference with individual liberty occasioned by the roadblock procedure, the state failed to present any evidence that the roadblock procedure advanced the public interest to a greater degree than would have been achieved by traditional methods of drunk-driving law enforcement, which are to be preferred because they are based upon a requirement of individualized suspicion. See Brown v. Texas, supra; Delaware v. Prouse, supra; Terry v. Ohio, supra. The state, no doubt, had the relevant evidence available to it, having conducted eight to ten roadblocks in Tippecanoe County alone in September, 1982, and having other records to show the effectiveness of traditional methods of enforcing drunk driving laws.
Recognizing that the roadblock procedure here at issue, in which the culpable and innocent alike were subject to seizure by law enforcement agents, lies at the very fringe of the fourth amendment, we are unwilling to validate this procedure absent some evidence that it is necessary, or at least more effective than available methods of drunk driving law enforcement, which are based on individualized suspicion aroused by observed conduct. Therefore, we hold that the state failed to meet its burden of proving the reasonableness of the warrantless seizure of defendant under the fourth amendment standard announced by the United State Supreme Court in Brown v. Texas, supra, and so, *48 we affirm the trial court's ruling that the fruits of that seizure must be suppressed. [Id. at 1141-1142].
Rightly or wrongly decided, we think this Indiana case was much closer than the case before us. From all that we can tell from the record before us, the location, time and duration of the road block on Rt. 550 late on a Saturday afternoon on October 15 was totally random and within the chance discretion of the officer on patrol. Nor was there any proof of efficacy at all and no inkling of any supervision by higher authorities.
A recent case arising in Maine, State v. Cloukey, 486 A.2d 143 (Me.Sup.Ct. 1985), provides an interesting contrast to the Indiana case. Cloukey involved a road block set up in daylight for the purpose of conducting a traffic safety check. The road block was set up by a deputy sheriff and a member of the state police with the permission of the County Sheriff who knew that the proposed location was on an historically high-accident stretch of roadway. The court noted only "a modest amount of involvement" by the supervisory authority as to the road block's location, but there was some. The court also found that Cloukey did not "involve a sobriety stop." Id. at 147. While acknowledging that it was a close case, the Maine court approved that road block as a constitutionally "minimal intrusion". The Maine court was convinced that the operation was not a subterfuge for drunken driving detection or a form of police harassment, and noted that although a written policy and higher-level supervision would have been preferable, it was not essential. Again, the case before us does not even have these minimal safeguards or justifications of a modicum of supervisory participation and the selection of a dangerous alcohol or accident-prone stretch of roadway. We have no way of telling if the road block could have been a subterfuge. All we know is there was no particular reason for the location, except that it was not on a main road. And we do know from the testimony of the trooper that the road block was not simply regulatory but that the stops also had as a purpose criminal investigation  to detect "anybody who appears to be intoxicated and any *49 drugs, anything in plain view of such sort." We think the Maine Supreme Court in Cloukey summarized the Prouse standard well in this context when it said: "It would be difficult to describe a more capricious and arbitrary basis for detention than the fact that the officer had nothing better to do." Id. at 145.
Maryland's highest court recently approved a sobriety road block in Little v. State, 300 Md. 485, 479 A.2d 903 (1984). The road block was operated as part of a state-police operated sobriety check point program to augment conventional patrols on state roads in Harford County which had demonstrably high alcohol-related accident rates. Check points were set up from 11 p.m. to 4 a.m. on weekend nights. (The court referred to statistics showing that these were the prevalent hours of offenses). There was widespread publicity. Comprehensive regulations governing the operation were reviewed and approved by the State Police, the Attorney General and the Governor; the date, time and location of each check point required the approval of the Chief of Field Operations of the State Police. The road blocks were well-lighted and marked so that the traveling public would not be frightened. They were also carefully and adequately staffed and supervised.
The Maryland high court reviewed many of the pertinent state and federal authorities and noted that "some courts have found road blocks to be unconstitutional where the authorities did not provide adequate procedures for limiting the discretion of field officers." Id. at 909, citing State v. Hillesheim, 291 N.W.2d 314 (Io.Sup.Ct. 1980) (two police officers decided to set up a road block at entrance to city park without supervisory authority); Como v. McGeoghegan, supra; State v. Olgaard, supra; State ex rel. Ekstrom v. Justice Court, supra; State v. Smith, 674 P.2d 562 (Okla. Crim. Appeal 1984) (this temporary sobriety check point unconstitutional as likely to cause fear and surprise as operated); Koonce v. State, 651 S.W.2d 46 (Tex. *50 App. 1983) (check point unconstitutional because there was no evidence of operation pursuant to objective, nondiscretionary departmental procedures). The Maryland Court observed that
A majority of courts, however, have sustained the use of roadblocks as a proper law enforcement tool. As a general rule, the constitutionality of traffic checkpoints has been upheld where: (1) the discretion of the officers in the field is carefully circumscribed by clear objective regulations established by high level administrative officials; (2) approaching drivers are given adequate warning that there is a roadblock ahead; (3) the likelihood of apprehension, fear or surprise is reduced by a display of legitimate police authority at the roadblock; and (4) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons. [Id. 479 A.2d at 911].
The court cited State v. Deskins, supra, where the location of road block was selected by supervisory personnel and not by officers in the field, as an example of a judicially approved operation. The record before the Maryland Court revealed that the sobriety checkpoint program had been an effective technique of detecting and deterring drunk drivers. Although temporary, the road blocks were established under a systematic plan which was reasonable. There was no danger that motorists in certain locations would be singled out for harassment. No judicial warrant was needed in advance because the decision to stop motorists was not in the hands of the officer in the field, but given to the administrative decision-making of higher ranking officers. 479 A.2d at 915. We find no disagreement with the Maryland Court's opinion in Little v. State, 479 A.2d 903. If set up properly and proven efficacious, the intrusion of a road block stopping all traffic or at consistent intervals can be constitutionally justified, but it must be justified by facts, not conjecture. We note that even the Maryland case and the Deskins case in Kansas drew dissents from judges who did not think the "candle worth the light" and believed that the record, even in these reasonably persuasive cases, did not justify the stops. Justice Davidson, dissenting in Little v. State, 479 A.2d 917, 920, pointed to Justice Stewart's statement in Almeida-Sanchez, 413 U.S. at 274, 93 S.Ct. at 2540 where he said: "The needs of law enforcement stand in constant tension with the *51 Constitution's protection of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to Constitutional safeguards."
Another recent case in which a road block was held unconstitutional is Jones v. State, 459 So.2d 1068 (Ct.App.Fla. 1984) (rehearing en banc denied, December 5, 1984, 459 So.2d 1081). The road block was set up at 2:30 a.m. on July 4, 1982 on Dale Mabry Highway, a main highway in greater Tampa. The purpose was to apprehend "DUI drivers." All northbound traffic was funnelled into one lane and every fifth vehicle was stopped when traffic was heavy and every third vehicle was stopped when traffic was light. The drivers were directed into a parking lot where five waiting officers checked credentials and determined if they were intoxicated. The Florida Court of Appeals held the road block unconstitutional, recognizing the issue as "extremely difficult." Id. at 1070. The court noted that all cases agreed that "the State has the burden of proof to show that a road block arrest is constitutional." Ibid. Accord State v. Valencia, 93 N.J. 126, 133 (1983). The court concluded "that even the approaches taken by the New Jersey [State v. Coccomo, supra] and Kansas [State v. Deskins, supra] courts would produce a holding that petitioner's arrest in the Florida case was unconstitutional." Ibid. The Florida court emphasized the characteristics of a valid road block set out in U.S. v. Martinez-Fuerte, supra, including "the decision to establish it having been made by officials on a higher level than patrol officers", id. at 1072, and observed that "nothing in Delaware v. Prouse suggests ... that the criteria for constitutionally permissible roadblocks as indicated in Martinez-Fuerte were relaxed," id. at 1073. Among the reasons for rejecting the constitutionality of this road block, the Florida Court of Appeals found there was no evidence that "the road block [was] conducted pursuant to a plan set up by supervisory personnel" with "little or no discretion in the method of operation and selection of vehicles left to the officers conducting the road *52 block". Id. at 1079. There was no evidence of the level of law enforcement personnel making the decision regarding location and method of operation. Ibid. The record failed to address several subjects which concerned the court including the presence of warning signs, the extent of inconvenience and alarm to motorists, significant effectiveness as compared to less intrusive means, and advance warning or notice to the public as deterrence. The Florida court was impressed, as are we, by the thoughts of Justice Feldman of the Arizona Supreme Court in his concurring opinion in State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 663 P.2d 992, 996 (1983), where a principal factor persuading the court on the issue was "a not insubstantial amount of discretionary law enforcement activity" where "the road blocks were set up at the discretion of a local highway patrolman and were operated without specific instructions or guidelines." Justice Feldman commented on the balance of the rights of citizens to travel unimpeded as against the rights of the police to set up road blocks when and where they liked without empirical justification.
The Terry exception to the probable cause requirement will not support the stops made in the instant cases because the roadblock stopped everyone  whether there was a founded suspicion or not. The issue here, therefore, is whether the fourth amendment permits officers to stop and question persons whose conduct is innocent, unremarkable and free from suspicion.
The question has frightening implications. The thought that an American can be compelled to "show his papers" before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals. If road blocks can be maintained to stop all persons, regardless of how innocent their conduct, for the purpose of investigating or apprehending drunk drivers, then presumably similar stops of all citizens could be undertaken for questioning and surveillance with regard to other crimes, such as possession of narcotics, possession of stolen property or burglary. It might be argued that if the law did permit such stops, we would have less crime. Nevertheless, our system is based on the idea that the risk of criminal activity is less of a danger than the risk of unfettered interference with personal liberty. The concept was succinctly expressed by a newspaper columnist who recently used these words in describing his opposition to roadblock stops for apprehension of drunk drivers:
I ... have often thought that getting killed by some intoxicated idiot who crossed the median divider and hit me head-on would be the worst and most senseless way to die.

*53 I mourn for the parents of children who have died at the hands of drunk drivers. But none of this makes a police state acceptable. Freedom doesn't come risk-free. I'm willing to take some risks in exchange for my freedom.
Andy Rooney, Roadblocks for Drunk Drivers Nibble Away at Our Freedoms, Chicago Tribune, reprinted in The Arizona Republic, April 4, 1983, at A7.
Justice Feldman then set out guidelines which he thought could, in the proper circumstance, constitutionally justify a road block. See 663 P.2d at 998-1001. We agree with these general principles, which describe how to constitutionally set up road blocks "in a manner calculated in advance to provide the least intrusion into the public's freedom and sense of security." Id. at 1001.
Significantly, one year after Judge Feldman's remarks a unanimous Arizona Supreme Court en banc approved a Tuscon sobriety road block under the Arizona and federal constitutions consistent with his suggestions in State v. Super. Ct. In and For County of Pima, 143 Ariz. 45, 691 P.2d 1073 (1984). "The stops were constructed and operated according to an extensive command directive compiled by the Commander of the Traffic Enforcement Division.... The checkpoints were to be set up on main, high volume arteries." Id. 691 P.2d at 1074. Most of the recommendations made by Justice Feldman were followed in the Tuscon case including command directives and "statistics compiled by the police department concerning the location of alcohol related collisions and chose[n] sites within approximately a square mile of where the highest percentage of such accidents had occurred." Id. at 1075; advance publicity as a deterrent was abundant.
During the same month, the highest court of New York also approved a drunken-driving road block under very much the same criteria in People v. Scott, 63 N.Y.2d 518, 483 N.Y.S.2d 649, 473 N.E.2d 1 (1984). In Scott the road block was "established pursuant to a written directive of the County Sheriff." Id. 483 N.Y.S.2d at 650, 473 N.E.2d at 2. Procedures limiting discretion and insuring safety of travelers were outlined in detail in the County Sheriff's memorandum. The predetermined check points were systematically geared to "high accident *54 locations" and "greatest risk ... weekend late evening/early morning hours" when the incident of drunken driving was statistically highest. Ibid. See also People v. John B.B., 56 N.Y.2d 482, 453 N.Y.S.2d 158, 438 N.E.2d 864, cert. den. 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982) (roving patrol in remote, sparsely populated rural area condoned to thwart rash of burglaries).
We return to the observations of Judge Lehan of the Florida Court of Appeals in Jones v. State, 459 So.2d 1068, and emphasize as he did that our holding does not condone the appellant's conduct but does mean that the courts also must "have substantial concern for the vast number of innocent motorists." Id. at 1071.
The point is not whether drunk drivers are a danger and a serious threat to public safety. That must be conceded by any reasonable person of good faith. The point is that the public interest in apprehending drunk drivers does not justify the use of any indiscriminate law enforcement methods of investigation and apprehension. As an admittedly extreme example for the purpose of illustrating that point, no reasonable person of good faith would disagree that house to house searches of arbitrarily selected neighborhoods to discover which citizens are drunk and are about to drive or might drive, which would terrorize the citizenry in the process, would be wrong. That that example is absurd in this country today may serve to emphasize what the Fourth Amendment has accomplished relative to the disregard for individual rights which had existed under British colonial rule not long before the Bill of Rights was adopted. [459 So.2d at 1078][6]
*55 We reverse the decision of the Law Division which held the seizure of appellant Kirk constitutional. We conclude that the record does not justify the roadblock, stop and seizure of defendant. The stop was concededly designed to check for criminal violations, as well as for credentials and vehicle safety. The road block was set up by the officers in the field, solely at their discretion as to time, place and duration. There was no evidence to justify the State's intrusion on the traveling public at this time and place. All authorities seem to agree in the many close cases we have discussed which fall to one side of the line of constitutionality or the other that the State must justify the procedures, showing both some substantial benefit to the public from the road-block stops and some appropriate control of the discretion of the officer in the field. Warrantless searches and seizures are "presumed to be invalid." State v. Valencia, 93 N.J. 126, 133 (1983); State v. Young, 87 N.J. 132, 141-142 (1982); State v. Patino, 83 N.J. 1, 7 (1980); State v. Ercolano, 79 N.J. 25, 42 (1979); State v. Sims, 75 N.J. 337, 352 (1978). The State has the burden of proving the "overall reasonableness and validity" of a warrantless search and seizure. Valencia, 93 N.J. at 133. On this record, we can only conclude that the State has failed to show that this road block *56 or check point was reasonable and justified in the circumstance. We see no reason in this record why "strong considerations of law enforcement and public safety impel a suspension of the normal high value embedded in the constitutions." Ercolano, 79 N.J. at 42. The police need not show probable cause to stop any individual driver but they must show some rational basis for deploying this type of intrusive law enforcement technique.

IV
In conclusion, we stress that this panel has recently expressed its particular concern for the problems presented by the drunken driver in this State. This term in Division of Motor Vehicles v. Kleinert, 198 N.J. Super. 363, 368 (App.Div. 1985), we upheld the power of Director of Motor Vehicles to suspend the license of a New Jersey resident convicted of drunken driving in Vermont, a state not signatory to the Interstate Drivers' License Compact. Last term in Matter of Kovalsky, 195 N.J. Super. 91 (App.Div. 1984), we held that the Director could suspend the license of a New Jersey resident who forfeited bail on a drunken driving charge in Georgia. See also Division of Motor Vehicles v. Lawrence, 194 N.J. Super. 1 (App.Div. 1983) (we upheld a New Jersey license revocation for New York drunken driving offense because the offenses of intoxicated and impaired operation were substantially similar). Concern for this social problem also has been manifested by our Supreme Court, see Kelly v. Gwinnell, 96 N.J. 538 (1984) (social host liability for drunken driver social guest); see also State v. Dively, 92 N.J. 573, 588, (1983); In re Kallen, 92 N.J. 14, 28 (1983), and the United States Supreme Court, South Dakota v. Neville, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (refusal to take blood test may be constitutionally used as evidence).
The Attorney General's brief eloquently stresses the problem of the drunken driver but also expresses commendable concern for the judicious and effective use of the check point or road block as a law enforcement tool within the strictures of the *57 applicable constitutions' respect for individual rights. The Attorney General's brief gives us this outline of the developing policy of establishing road blocks and check points which meet the various criteria discussed in the many cases we have surveyed.
On November 2, 1983, several weeks after defendant's arrest, the State Police issued Official Training Bulletin 3-83, which moved away from the most crucial modification of police activity as a result of Prouse (banning completely random stops) and began to focus upon the establishment of fixed traffic spot checks as a law enforcement tool. Bulletin 3-83 set up four factors for officers to consider in selecting a traffic check location: 1) accident and violation experience, 2) volume of traffic, (3) safety and 4) deterrence against those who drive while under the influence of alcohol or other drugs. This bulletin also directed that traffic checks be conducted in accordance with the policy set forth in Official Training bulletin 1-79, i.e., stopping vehicles in increments of five, depending on traffic volume. Finally, on April 12 and 19, 1984, the New Jersey State Police released Operations Instructions 84-25 and 84-29 respectively, which no longer concerned the previously abandoned practice of random vehicle stops, but instead set forth an elaborate scheme of factors pertaining to the institution and physical characteristics of sobriety checkpoints.
As a consequence of the above circumstances, it is clear that the current State Police procedure regarding roadblocks and checkpoints is markedly different and considerably more comprehensive than the plan in effect on October 15, 1983, the date the defendant was detained. As of October 1983, only State Police Official Training Bulletin 1-79 had been issued. As previously noted, defendant attacks only the specific factors associated with the traffic check which resulted in his detention and eventual arrest on October 15, 1983. [Brief of Attorney General, p. 7-8].
The written "operations 84-25 and 84-29 instructions" issued in April 1984 by Lt. Colonel Dentino, Deputy Superintendent of the State Police, gave precise instructions for conducting sobriety check points. These instructions insured command supervisory siting and control of check points, careful procedures for moving check points, warning to motorists to allay fears of the traveler, safety of motorists, sufficient staffing to prevent undue inconvenience to motorists, and selection of sites and times designed to benefit the overall effort to cope with drunken driving. Holidays such as Memorial Day, Fourth of July, and Labor Day were targeted; site priority was recommended by the Troop Traffic Analyst and was on the basis of "areas high in alcohol-related accidents"; full reports in writing of the conduct of the road block are promptly submitted to troop *58 supervisors and commanders. Advance publicity of these efforts has been pervasive and undoubtedly has acted as a substantial deterrent to potential inebriated operators.
We are satisfied that if these procedures are carefully followed, any constitutional objections will be overcome. We cannot condone the investigative type of road block we have seen in the case before us, set up by an officer in the field, obviously at a random time and location, for no specific duration, inadequately manned, and not designed for any particular preventative purpose, other than to pull drivers over to see what might turn up in the way of alcohol or drug-related criminal activity, and perhaps some regulatory violations. This is where we draw the line between rational law enforcement and random seizures based on "luck and hunch" alone, State v. Patino, 163 N.J. Super. 116, 125 (App.Div. 1978), aff'd 83 N.J. 1 (1980), which inconvenience citizens without any justification of substance. The order denying suppression is
Reversed.
NOTES
[1] We have also been provided with a November 2, 1983 supplement to Bulletin # 1-79 which states that traffic interception procedure is a "valuable tool for members of the Division of State Police." The Bulletin states that "when properly conducted it serves four general purposes: (1) increases contacts with the motoring public, (2) assists members in discovering violations of the law, (3) directes police attention to criminal activities, and (4) creates the psychological impression that law enforcement is omnipresent."

In selecting a location the Bulletin states that a principle factor is "deterrence against those who drive while under the influence of alcohol or other drugs."
[2] The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.
[3] The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
[4] We stress that this case has nothing to do with road blocks set up near scenes of recent serious crimes or to apprehend fleeing felons. These situations are discussed at 3 LaFave, Search and Seizure, § 9.5 at 140 (1978); see also A Model Code of Pre-arraignment Procedure, § 110.2(2) at 7 (ALI 1975).
[5] The McLaughlin court wrote:

Five decisions have upheld, as consistent with the fourth amendment, the conduct of DUI roadblock in question. See State v. Deskins, (1983), 234 Kan. 529, 673 P.2d 1174; Kinslow v. Commonwealth, (1983) Ky. Ct. App., 660 S.W.2d 677; State v. Coccomo, (1980) 177 N.J. Super. 575, 427 A.2d 131; People v. Scott, (1983) 122 Misc.2d 731, 471 N.Y.S.2d 964; People v. Peil, (1984) 122 Misc.2d 617, 471 N.Y.S.2d 532. Five other decisions have found the conduct of the roadblock in question violative of the fourth amendment. See State ex rel. Ekstrom v. Justice Court (1983) 136 Az. 1, 663 P.2d 992; People v. Bartley, (1984) 125 Ill. App.3d 575, 80 Ill.Dec. 894, 466 N.D.2d 346; Commonwealth v. McGeoghegan, (1983) 389 Mass. 137, 449 N.E.2d 349; State v. Smith, (1984) Okla. Crim. App., 674 P.2d 562; State v. Olgaard, (1976) S.D., 248 N.W.2d 392. In addition, other courts have considered the constitutionality of roadblocks conducted for other purposes. See United States v. Prichard (10th Cir.1981) 645 F.2d 854 (evidence seized at roadblock conducted for purposes of checking drivers' licenses and vehicle registrations held admissible); People v. Long, (1984) 124 Ill. App.3d 1030, 80 Ill.Dec. 332, 465 N.E.2d 123 (evidence of driver's intoxication discovered at roadblock established to check driver's licenses held admissible); State v. Hilleshiem, (1980) Iowa, 291 N.W.2d 314 (evidence seized at roadblock in city park to identify possible witnesses to ongoing park vandalism held inadmissible under fourth amendment); State v. Baldwin, (1984) [124] N.H. [770], 475 A.2d 522 (scope of questioning at roadblock held to exceed unconstitutionally its purpose, to check compliance with motor vehicle and fish and game laws); Koonce v. State, (1983) Tex. Crim.App., 651 S.W.2d 46 (evidence seized at roadblock to check drivers' licenses held inadmissible under fourth amendment). [Id. 471 N.E.2d at 1134-1135].
[6] Judge Lehan added these comments in Jones v. State

A similar type of concern was expressed by Justice Prager [dissenting] in Deskins: "If each of [the] political subdivisions [in Kansas] decides to maintain a roadblock, we could have `Checkpoint Charley' at the boundary of every city and every county." 673 P.2d at 1188. Similarly, if the Tampa police can set up a temporary roadblock of this kind for DUI purposes on Dale Mabry Highway, why could not the Tampa Police have also set up other such DUI roadblocks at various other locations in Tampa at the discretion of other sergeants (however much sergeants do deserve and have earned respect and authority)? For that matter, why could not they set up still other roadblocks for a variety of other law enforcement purposes? And if the Tampa police could do so, why not the Hillsborough County sheriff's department, the Pinellas County sheriff's department, the City of St. Petersburg police, and law enforcement authorities of all the various small municipalities in the area, with the end result being "Checkpoint Charleys" for innocent motorists to encounter perhaps even multiple times in the course of a drive? We, as Justice Prager, could not accept this as a way of life in our constitutional democracy.
We do not suggest that law enforcement authorities in Florida contemplate a scenario that might be indicated by the foregoing questions. We expect that the judgment of law enforcement supervisory personnel in establishing proper roadblocks, if the foregoing criteria are fulfilled, would take into account those concerns expressed by Justices Feldman and Prager which we agree are valid and important. Even a valid roadblock within the foregoing criteria should be employed with reasonable circumspection. Our democratic form of free government continues to exist because our laws do not permit restraints of that kind upon our freedoms. As is sometimes also attributed to Thomas Jefferson, "Eternal vigilance is the price of liberty." John Philpot Curran, Speech Upon the Right of Election, (1790). [459 So.2d at 1080].