228 N.J. Super. 267 (1988)
549 A.2d 491
STATE OF NEW JERSEY,
v.
FRANK BARCIA, AND ALPHONSE J. SIRACUSA, DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
Decided August 5, 1988.
*270 Philip Tornetta, Assistant Prosecutor, for the State (Larry J. McClure, Bergen County Prosecutor).
Brian J. Neary, for Defendant Barcia.
Joel Reinfeld, for Defendant Siracusa.
NAPOLITANO, J.S.C.
This case addresses the constitutionality under both the United States Constitution and the New Jersey Constitution of a roadblock established by the State of New Jersey at the George Washington Bridge in Fort Lee, New Jersey, on September 12, 1986. Because this Court finds that the roadblock violated (a) both the Fourth Amendment to the U.S. Constitution[1] *271 and Article I, paragraph 7 of the N.J. Constitution, and (b) the defendants' and others' right to travel, and (c) the Commerce Clause of the U.S. Constitution, the roadblock is constitutionally infirm and so all evidence of criminality obtained from these defendants is suppressed.

I. The Roadblock of September 12, 1986.

On Friday, September 12, 1986, at approximately 8:46 p.m., the defendants herein were traveling in an automobile from New York City to New Jersey across the George Washington Bridge. The automobile was ordered to the side of the roadway in Fort Lee, New Jersey, by law enforcement officials who had established a roadblock for the purpose of detecting persons operating vehicles who were transporting controlled dangerous substances or were under the influence of drugs or alcohol.
Larry J. McClure, the Bergen County Prosecutor, along with the chiefs of the Fort Lee, Palisades Interstate Parkway, and Bergen County police departments, determined substantially in advance of September 12, 1986, that roadblocks at the George Washington Bridge would serve useful law enforcement purposes because of the high incidence of drug activity in the area, particularly the transportation of the "crack" form of cocaine across the George Washington Bridge from the Washington Heights area of New York City into Bergen County, New Jersey. Several New Jersey newspapers had, prior to September 12, 1986, announced in various prominent articles that the Prosecutor was planning roadblocks in this area and for this purpose.
*272 After the agreement to establish the roadblocks had been reached, the Prosecutor formulated and promulgated guidelines that would govern the implementation of the roadblocks. The Prosecutor's guidelines were adapted from those used by the New Jersey State Police to govern their drunk driving roadblock operations, which the Prosecutor believed had received judicial sanction in State v. Kirk, 202 N.J. Super. 28 (App.Div. 1985).
In addition to the State Police guidelines, the Prosecutor directed the police to follow other procedures. He mandated the presence of a police officer at each checkpoint throughout the roadblock area who was specially trained in narcotics investigations and in detecting the symptoms of motorists under the influence of alcohol and drugs. He also sought to minimize inconvenience to persons stopped by notifying area hospitals in advance of the possible need to take blood and urine samples.
The roadblock here under scrutiny was the first of a series approved by the Prosecutor and it occurred on Friday, September 12, 1986. The written request of Lieutenant James Matt of the Fort Lee Police Department satisfied the Prosecutor that there was particularly heavy trafficking of crack from New York City to New Jersey between approximately 7 p.m. and 3 a.m. during the weekends. Four "checkpoints" were set up throughout the roadblock on the New Jersey side of the George Washington Bridge on September 12, 1986 in the areas where the Prosecutor believed they would yield the most significant results and at the same time the least inconvenience to the public. Each driver stopped by the police who was not ordered to the side of the roadway was given a printed brochure which warned of the personal and public risk of driving under the influence of alcohol or drugs. The roadblock was set up at 7:30 p.m. and terminated at 10:50 p.m. There was one county police captain, two county detectives, and eight uniformed police officers supervising and operating this particular checkpoint which was located in Fort Lee several hundred yards west of the point *273 on the public highway where the lower level of the George Washington Bridge joins New Jersey.
The first vehicle was stopped at approximately 8:00 p.m., and the next vehicle was stopped five minutes later. Vehicles were then stopped every two minutes until 8:26 p.m. After that, a vehicle was stopped approximately every minute. The roadblock was announced by signs, and traffic was funneled through the checkpoints of this roadblock by cones, flares, and lighted police vehicles. During the operation, approximately one out of every twenty vehicles was stopped briefly for a license, registration, and insurance card check and for the detection by observation of any drugs or of any driver under the influence of drugs or alcohol. When all police personnel at the roadblock were occupied, traffic, though narrowed to one lane, was allowed to pass and thus was neither counted nor stopped.
On the evening in question, a total of fifty-nine vehicles out of the many which were stopped were actually ordered off the main thoroughfare to the side of the roadway and from those vehicles nine persons were arrested. The defendants herein  two of the nine arrestees  were charged with possession of controlled dangerous substances, possession of drug paraphernalia, being under the influence of a controlled dangerous substance, and possession of a controlled dangerous substance in a motor vehicle. At the time the defendants' vehicle was stopped, the police observed in it a brown paper bag containing syringes and ten small packages of white powder labeled "Dynamite." Neither of these defendants was charged with operating a motor vehicle in an illegal manner. Both defendants now move to suppress the physical evidence (including urine samples which were later taken and which were positive for narcotics) obtained by the police from their search of the vehicle, asserting that the roadblock at which they were stopped was unconstitutional.

*274 II. The Interdiction of Defendants' Fundamental Liberties.

The use by the police of a roadblock which actually stops motor vehicles on a public thoroughfare for the purpose of detecting evidence of criminality facially interdicts the constitutionally protected fundamental liberties of persons to be free from unreasonable governmental intrusion and to travel freely on public highways. The right to be free from unreasonable governmental intrusion is protected by the Fourth Amendment to the United States Constitution and, in New Jersey, by Article I, paragraph 7 of the New Jersey Constitution.[2] The right to travel freely is protected by the Fifth and Fourteenth Amendments to the U.S. Constitution.
The Fourth Amendment to the U.S. Constitution applies to all seizures of the person including seizures that involve only a brief detention short of traditional arrest. Whenever a police officer restrains the freedom of a person to leave, the reasonableness of such a restraint depends upon a balance between the public's interest in enforcing law and the individual's right to personal security free from arbitrary intrusions by the government. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); State v. Kirk, 202 N.J. Super. at 40. The Brignoni-Ponce *275 case is particularly instructive here since it invalidated the use by the federal government of roving border patrols which randomly stopped motor vehicles in order to search for the presence of illegal aliens. Prouse is similarly instructive since it invalidated random police roadblocks seeking to ferret out drunk drivers from among the driving public. In both cases the court held that no seizures may be conducted unless the government can show that it had an articulable suspicion for seizing the specific person. While the Supreme Court did not rule on and did not rule out all warrantless automobile stops where there is less than articulable suspicion, it invited trial courts to scrutinize carefully the reasonableness of all stops. Justice Powell wrote in Brignoni-Ponce at 422 U.S. at 878, 95 S.Ct. at 2578, 45 L.Ed.2d at 614-615, that:
The Fourth Amendment applies to all seizures that involve only a brief detention short of traditional arrest, Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1, 16-19, 88 S.Ct. 1868 [1877-1879], 20 L.Ed.2d 889 (1968) and the Fourth Amendment requires that the seizure be "reasonable." As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. Terry v. Ohio, supra, at 20-21, 20 L.Ed.2d 889, 88 S.Ct. 1868 [at 1879-1880]; Camara v. Municipal Court, 387 U.S. 523, 536-537, 87 S.Ct. 1727 [1734-1735], 18 L.Ed.2d 930 (1967).
Since the basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals from unreasonable (i.e., arbitrary, unbalanced, or excessive) intrusion by government officials, Camara v. Municipal Court, 387 U.S. at 538-540, 87 S.Ct. at 1735-1736, 18 L.Ed.2d at 935, an analysis of the constitutionality of all warrantless seizures requires a trial court to assess the reasonableness of the government's behavior by balancing the gravity of the government's concerns against the severity of the interference with individual liberty. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).
*276 Our own state courts have also held that Article I, paragraph 7 of the New Jersey Constitution, which is always at least coterminous to the Fourth Amendment, proscribes those searches and seizures that are unreasonable. State v. Bruzzese, 94 N.J. 210 (1983). Normally the constitutional requirement of reasonableness is satisfied where the government, upon a showing of probable cause, obtains a search warrant from a judge of competent jurisdiction. However, the seizure of a person without a warrant is presumed to be invalid and the government has the burden of proving the overall reasonableness and validity of such a seizure. State v. Valencia, 93 N.J. 126 (1983). Both the United States Supreme Court and the Supreme Court of the State of New Jersey have consistently asserted that the right to be free from unreasonable governmental intrusion is of the very essence of constitutional liberty and is one of our most protected rights. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); State v. Bruzzese, 94 N.J. at 213.[3]
The leading case in New Jersey governing the constitutionality of roadblocks is State v. Kirk, an Appellate Division opinion, decided exclusively on New Jersey and not federal constitutional grounds. After a careful survey and analysis of the relevant federal cases addressing the circumstances under which a person may be seized, and the cases of our sister states, addressing the circumstances under which roadblocks have elsewhere survived constitutional challenge,[4] and the New Jersey cases *277 bearing upon governmental intrusion as it offends the N.J. Constitution, the Kirk court held that any New Jersey constitutional objections to a roadblock will be overcome if three criteria are met: (a) establishment of the roadblock by command authority, (b) careful targeting of a designated area at a specified time and place, based upon data justifying the site selection, and (c) adequate warnings to the public near the site of the roadblock, together with advance general publicity, and neutral, courteous procedures.
In the facts here under scrutiny, the Court finds that the Prosecutor of Bergen County was aware of Kirk but did not meet all of its requirements. At the motion to suppress, the State produced evidence of its awareness of drug trafficking from Washington Heights in Manhattan across the George Washington Bridge to Fort Lee, N.J. It also produced evidence that the roadblock in this case was planned and supervised by the Prosecutor or his first assistant, was the subject of warnings both in the media and at the roadside, and was conducted by uniformed officers who were courteous, and who used a numerical determination as to which car to stop.
However, Kirk invites an analysis under federal constitutional principles, 202 N.J. Super. at 38-40, and thus allows that any roadblock may be found constitutionally wanting under the U.S. Constitution if the balancing of the severity of the interference with individual liberty is not outweighed by the gravity of the immediate pressing need for public safety and if the result of the activities which interfere with individual liberty does not adequately serve the public need. This balance prong of the reasonableness test, of course, is at the heart of any inquiry about constitutionality under both the U.S. Constitution and the N.J. Constitution and ought to be applied by a *278 trial court for any warrantless stop by any government of any person for any reason other than a particularized suspicion involving the stopped person. In Brown, Chief Justice Burger wrote for a unanimous court that "The reasonableness of seizures that are less intrusive than a traditional arrest, depends `on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers,'. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." 443 U.S. at 50-51, 99 S.Ct. at 2640, 61 L.Ed.2d at 361 (citations omitted). In Bruzzese, Justice Garibaldi wrote that "a warrantless search is presumed to be invalid. Hence the State must prove the overall reasonableness and validity of [such a] search." 94 N.J. at 218. The Bruzzese court held that all the recognized exceptions to the warrant requirements of either the Fourth Amendment to the U.S. Constitution or Article I, paragraph 7 of the N.J. Constitution are justified only on the grounds of reasonableness. State v. Bruzzese, id. In Kirk, Judge King wrote that the State must prove that the "roadblock or checkpoint was reasonable or justified in the circumstance." 202 N.J. Super. at 55-56. It is incumbent, then, upon a trial court to apply the balance prong of the reasonableness test which the Brown and Bruzzese and Kirk courts mandated.
A second prong of the reasonableness test must also be applied because another right ostensibly interfered with here  freedom to travel  is itself a fundamental liberty, the interference with which requires the State to meet the strict scrutiny prong of the reasonableness test in addition to the balance prong discussed heretofore.
Freedom to travel has long been recognized as a basic right *279 under the U.S. Constitution.[5]Attorney General of New York v. Soto Lopez, 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); Memorial Hospital v. Maricopa County, 415 U.S. 250, 255, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974); Shapiro v. Thompson, 394 U.S. 618, 631, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600, 613 (1969); United States v. Guest, 383 U.S. 745, 757-758, 86 S.Ct. 1170, 16 L.Ed.2d 239, 249 (1966). In Shapiro v. Thompson, the State of Connecticut imposed as a condition to receiving welfare benefits a one year residency period. Justice Brennan wrote for the Supreme Court that any state action "which serves to penalize the exercise of that right (to travel freely), unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." 394 U.S. at 634, 89 S.Ct. at 1331, 22 L.Ed.2d at 615 (emphasis in original). The right to travel is a "virtually unconditional personal right," Shapiro, 394 U.S. at 643, 89 S.Ct. at 1331, 22 L.Ed.2d at 620, the exercise of which may not be restrained more than incidentally except under the strict scrutiny test. "The right to travel has been described as a privilege of national citizenship, and as an aspect of liberty that is protected by the Due Process Clause of the Fifth and Fourteenth Amendments." Jones v. Helms, 452 U.S. 412, 419, 101 S.Ct. 2434, 2440, 69 L.Ed.2d 118, 124-125 (1981).
It is a fundamental and well-grounded principle of constitutional construction that whenever a state action infringes upon a constitutionally protected fundamental liberty, the court must undertake highly intensified or strict scrutiny of that action. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 16, 93 S.Ct. 1278, 1281, 36 L.Ed.2d 16, 40 *280 (1973). In such cases, the State must come forward with a compelling state need, and a demonstration that the state action which supports the compelling state need is the least restrictive means available to the State under the circumstances and actually does serve the need. Attorney General of New York v. Soto Lopez, 476 U.S. at 902-903, 106 S.Ct. at 2321-22, 90 L.Ed.2d at 505; Barone v. Department of Human Services, 107 N.J. 339, 364-365 (1987). If there are other reasonable ways to achieve the state's goal, with at least one causing lesser burden on constitutionally protected activity, "a state may not choose the way of greater interference." Smith v. Paulk, 705 F.2d 1279, 1284 (10th Cir.1983) citing San Antonio School District v. Rodriguez, 411 U.S. at 16-17, 93 S.Ct. at 1287, 36 L.Ed.2d 16 (1973) and Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972).
Returning now to an application of the aforestated federal and New Jersey constitutional principles to the facts in this case, it becomes clear that the roadblock here under scrutiny (a) did not balance the gravity of the public's legitimate immediate law enforcement needs against the severity of the interference with individual fundamental liberties and (b) was not reasonable under the strict scrutiny test. On September 12, 1986, between 7:30 p.m. and midnight, as a result of the roadblock here under scrutiny, traffic came to a complete halt from Fort Lee, New Jersey, over the George Washington Bridge, down the West Side Highway in Manhattan to West 56th Street; from Fort Lee, New Jersey, across the George Washington Bridge, up Route 95 to Riverdale in the Bronx; and from Fort Lee, New Jersey, across the George Washington Bridge, over the top of Manhattan, down the FDR Drive, and across the Triboro Bridge in Queens. Captain Robert Herb of the Bergen County Police Department, (at this writing the Sheriff of Bergen County), who was the highest ranking uniformed officer supervising the roadblock, testified that as a result of the roadblock here under scrutiny over one million motor vehicles came to a complete stop, in some cases for in excess of four hours, and that it was not until some hours after the roadblock in Fort Lee *281 itself was dismantled that this traffic morass of monumental proportions unwound itself. Out of this serious impediment to the freedom to travel to over one million persons at one of the most heavily traveled thoroughfares in the country came fifty-nine motor vehicles which were ordered to the side of the road and searched, and from those fifty-nine vehicles there came nine arrests.
To suggest that the foregoing scenario even remotely struck a balance (i.e., gravity of public need versus severity of interference with liberty) as required by Brown v. Texas, and State v. Bruzzese, and State v. Kirk, is to reject the notion of balance itself. Balance requires respect and equipoise, i.e., a mutual recognition of the relation of the rights and needs of one entity to the other, and the diminution of one of the entities only to the extent of the legitimate pressing directly conflicting needs of the other entity.[6] The State here has not shown even a prima facie balancing. To stop one million vehicles in order to search fifty-nine vehicles and arrest nine persons shows no healthy respect by the State for the rights of persons both to be free from governmental intrusion and to travel freely on public highways and seriously and egregiously diminishes those rights substantially beyond the legitimate pressing needs of the public. This is the type of unbridled discretion  whether directed *282 by civilians or police  which Kirk condemned. 202 N.J. Super. at 39, 43-44.
From this substantial quantitative disparity between the numbers whose rights were violated and the numbers arrested arises an inquiry as to the qualitative imbalance. The result of this roadblock is clear evidence that roadblocks do not always serve the need for which they were intended. A greater number of persons manned this roadblock than were actually arrested. Could not this manpower be better utilized to scrutinize highways near establishments which serve alcohol or dens of iniquity suspected of selling drugs? Is not the State wasting the talents of police trained to detect erratic motorists by isolating that talent in one tight location and utilizing it to observe motor vehicles which have already come to a complete halt? Should not the State which here violated the liberty of at least fifty-nine persons to be free from unreasonable government intrusion and the liberty of at least one million persons to travel freely realize that the likelihood of finding a person who is committing a crime when the person exhibits not a scintilla of suspicion is slim? The Chief Justice in Brown could very well have entertained these inquiries when he wrote for a unanimous court that trial judges must assess "the degree to which the seizure advances the public interest," 443 U.S. at 51, 99 S.Ct. at 2640, 61 L.Ed.2d at 362. Consistent with Brown, the Appellate Division in Kirk held that only roadblocks which have a "substantial benefit to the public" will meet state constitutional muster. 202 N.J. Super. at 55 (emphasis added). The State has not produced convincing evidence that this roadblock served the public interest; it cannot now be heard to argue that an egregious invasion of constitutionally protected fundamental liberties is a reasonable and acceptable by-product of serving that public interest. Such argument is a non sequitur.
Notwithstanding the State's fatal failure to survive the balance prong of the reasonableness test, this Court will continue to address the public policy implications of this roadblock. Here, where the activity intervened is itself a constitutionally *283 protected fundamental liberty  freedom to travel  and where the intervention is more than incidental (e.g., to pay a toll, to travel at a safe speed, to detour because of a collison, etc.), the reasonableness test has a second prong which requires the State to pass the strict scrutiny analysis (See ante at 278-280). As Kirk prudently observed, the dangers of driving a motor vehicle under the influence of alcohol or drugs are self-evident and the potential for harm caused by abusers of alcohol and users and transporters of illegal drugs  behind the wheel and elsewhere  is extraordinary. 202 N.J. Super. at 56-58. Clearly, New Jersey does have a compelling state interest in highway safety and stopping transportation of illegal drugs, but law enforcement personnel do not have the right to use extraconstitutional means to address that compelling state interest unless they can show that all other less restrictive means have failed or are likely to fail. The State has not made such a showing here. Here, the State asserted the source of persons driving under the influence of alcohol or drugs or transporting illegal drugs was Washington Heights in Manhattan. The State made no effort to interdict the drugs or discover their intended route at their source. The police, in conjunction with other law enforcement agencies, should physically observe automobiles as they maneuver about Washington Heights in known drug-selling neighborhoods; they should look for signs of drug-related activities involving (potential) occupants of vehicles which (further observation may reveal) make their way to New Jersey; they should follow persons in automobiles whom they suspect are driving while intoxicated or involved in drug-related activities and develop sophisticated means of identifying persons driving under the influence of drugs or alcohol; they should utilize their training and sources to detect alcohol or drug-related activities of motorists and look for signs of erratic driving and acquire articulable suspicion *284 and interdict the persons involved.[7] "Absent some empirical data to the contrary, it must be assumed that finding" a drunk or drugged motorist among those who exhibit some erratic or inculpatory behavior "is much more likely an event than finding" a drunk or drugged motorist from among one million vehicles stopped because of a roadblock. Prouse, 440 U.S. at 659, 99 S.Ct. at 1399, 59 L.Ed.2d at 671. "If this were not so" then drunk and drugged motorists would hardly pose the threat to the safety of our highways which recent history and common sense have told us that they do. Id. "It seems common sense that the percentage of all drivers on the road who are driving" under the influence of alcohol or drugs "is very small and that the number [of law abiding motorists] who will be stopped" at roadblocks "in order to find one" violating the law "will be large indeed." Id. at 659-660, 99 S.Ct. at 1399-1400.
The showings which this opinion underscores  the Brown and Bruzzese and Kirk arbitrariness test and reasonableness test with the balance prong and the strict scrutiny prong  should not be viewed lightly. The notion that because very special and unique governmental and public interests could not adequately be served if a traditional case-by-case individual articulable suspicion were required may be a basis under Camara for relaxed Fourth Amendment protection in the case of administrative and regulatory searches is an enormous leap from the circumstances of a roadblock. The police at a roadblock are not looking for violations of zoning or health or labor regulations; they are looking for hard evidence of serious criminality, the consequences of which in New Jersey expose motorists and their passengers to heavy sanctions. The facts here under scrutiny demonstrate that a seizure pursuant to a neutral plan, conducted by high level civilian authorities, located at a statistically chosen, publically announced site of a *285 person merely because he is a member of a class  motorists lawfully on a public thoroughfare at a given time and place  may be as much a seizure with consequences as burdensome and just as repugnant to the Fourth Amendment to the U.S. Constitution and to Article I, paragraph 7 of the N.J. Constitution as is a seizure randomly conducted by a single police officer of a person lawfully present on a public sidewalk.[8] Chief Justice Burger recognized this when he wrote in Prouse that:
An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry v. Ohio, supra, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles. [440 U.S. at 662-3, 99 S.Ct. at 1355-56, 59 L.Ed. at 673,] (citations omitted, emphasis added).
The emphasized words are of enormous historical, constitutional, and practical importance. They reflect the long held and *286 fundamental notion that any stop of any person by any government for any reason short of articulable suspicion can be so egregious an interference with personal liberty in a free society that only under the strict scrutiny test may it be condoned. Because the State here failed both the balance and the strict scrutiny analyses, (though either failure alone requires invalidation of the roadblock), this roadblock is per se unreasonable and thus is constitutionally infirm.

III. The Commerce Clause Implications.

The location of a roadblock a few yards from an interstate border and the magnitude of the traffic delay caused by it necessarily raise questions as to the extent to which the State's actions here under scrutiny impermissibly affected interstate commerce. The Commerce Clause of the United States Constitution is "a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." South Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71, 76 (1984). This limitation is not absolute since states "retain authority under their general police powers to regulate matters of `legitimate local concern' even though interstate commerce may be affected." Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702, 711 (1980).
The New Jersey Supreme Court recently held that New Jersey's actions "affecting [interstate] commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation." First Family Mort. Corp. v. Durham, 108 N.J. 277, 284 (1987).
The U.S. Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137, 178, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178 (1970), held that where the state action "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate *287 commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."
Professor Tribe has cautioned that "[e]ven if state action does not go so far as to prohibit the very acts which the federal government requires (or vice versa), it may nonetheless be struck down if it is in `actual conflict' with the objectives that underlie federal enactments. Thus, state action must be invalidated if its effect is to discourage conduct that federal action seeks to encourage." Tribe, American Constitutional Law 378 (1978). The U.S. Supreme Court has held since as far back as 1897 that citizens have a right, free from unreasonable state restraints, to engage in interstate commerce, Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897). That right stems dually from Congress' determination to facilitate free trade among the states, see Frankfurter, J., writing for the Court in McLeod v. J.E. Dilworth Co., 322 U.S. 349, 330, 64 S.Ct. 1030, 1026, 88 L.Ed. 1304, 1306 (1944), "The very purpose of the commerce clause was to create an area of free trade among the several States", and from the privileges or immunities clause of the U.S. Constitution, see Crutcher v. Kentucky, 141 U.S. 47, 11 S.Ct. 851, 35 L.Ed. 649 (1891). While not all state action which facially restrains interstate commerce necessarily contravenes federal purposes, Pike v. Bruce Church, Inc., a court must analyze the federally guaranteed rights of individuals whose commercial activities were restrained by this roadblock. See Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976), in which the court endorsed Congress' continued affirmative intention to remove all barriers to interstate commerce.
*288 The state action here under scrutiny again fails to meet federal constitutional muster because it imposed a burden on interstate commerce substantially greater than any benefit derived on account of the imposition, and because it isolated New Jersey from a problem common to all states in a manner which for several hours halted all commerce on one of the nation's busiest interstate thoroughfares. See Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (a state may not, absent congressional consent, isolate itself from a problem common to all states by impeding interstate commerce). While the U.S. Supreme Court has never required the application of the strict scrutiny test to interstate commerce, (but cf., discussion of Shapiro v. Thompson, ante at 279), it nonetheless in Pike v. Bruce Church, Inc., required lower courts, in conducting a balancing analysis, to inquire as to the availability of accommodation.
The discussion, ante, of balancing with respect to Fourth Amendment protection needs modification for Commerce Clause analysis. Notwithstanding the compelling state interest the State has in ridding its highways of motorists influenced by drugs or alcohol or transporting drugs, it may not, absent congressional consent, stop all commerce at a major interstate border in order to address that interest.
Applying the foregoing federal constitutional principles to the facts in this case, it is clear that the total immobilization of vehicular traffic as set forth above  albeit on a Friday evening in mid-September  is a serious substantial restraint on interstate commerce vastly out of proportion to the putative benefits  the detection of nine drunk or drugged motorists  and one which only the Congress could authorize. In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258, 269 (1964), Justice Clark wrote for a unanimous court that "[I]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.... Thus the power of Congress to promote interstate commerce also includes the power to regulate *289 the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce."
While the balancing here, too, requires equipoise and respect, see ante at 280-282, it need not be as exacting or refined a balancing as in the case of a fundamental liberty at tension with a compelling state interest. Notwithstanding that more impedence of interstate commerce would be condoned than was strictly needed in a given case (the State must show accommodation of interstate commerce, not precise balancing), the impedence here  near total cessation of commerce at a major interstate thoroughfare for several hours  cannot seriously be said to be balanced with the benefit  the detection of evidence of criminality involving nine persons. It is not only the numerical disparity here which compels the conclusion that the State's need to maintain safe highways was not outweighed by its interference with interstate commerce, it is the State's utter disregard for interstate commerce, its failure to accommodate by any alternative means legitimate commercial needs at this heavily travelled interstate border, which also compels the conclusion that the Commerce Clause was violated. Facial interference with interstate commerce does not trigger a strict scrutiny analysis, but it does require both a facial balance and an accommodation to the needs of legitimate commerce. The State here elected to address neither.

IV. Conclusion.

Where a police roadblock stops vehicles lawfully present on a public thoroughfare for the purpose of detecting evidence of criminality, in order to survive a constitutional challenge under both the U.S. Constitution and the N.J. Constitution, the roadblock must be reasonable, i.e., the State must show absence of arbitrariness, it must balance the gravity of public needs against the severity of interference with individual liberties, and where the right to travel is more than incidentally *290 interfered with, the roadblock must pass the strict scrutiny test. Where interstate commerce is more than incidentally affected, the State, absent congressional consent, must show some balance of its needs against, and an accommodation of, legitimate commercial interests. The roadblock here under scrutiny was not reasonable because it resulted in a more severe invasion of individual liberties than public needs required and was not the least restrictive means to address those needs; moreover, it made no accommodation for interstate commerce. In accordance with the foregoing, the evidence seized by the police from these defendants at this roadblock is suppressed.
NOTES
[1] Although the State has not challenged jurisdiction, it should be noted that the Superior Court of New Jersey has jurisdiction to rule upon federal questions. Smayda v. United States, 352 F.2d 251, 253 (9th Cir.1965); Vassar v. Raines, 274 F.2d 369, 371 (10th Cir.1959), cert. den., 362 U.S. 982, 80 S.Ct. 1069, 4 L.Ed.2d 1016 (1959); Aftanase v. Economy Baler Co. 343 F.2d 187 (8th Cir.1965).
[2] While the wording of the Fourth Amendment to the U.S. Constitution and Article I, paragraph 7 of the New Jersey Constitution are almost identical, State v. Kirk, 202 N.J. Super. at 35, case law has consistently held that the New Jersey Constitution may afford greater protection of freedom from intrusion by the government than does the United States Constitution. See Michigan v. Long 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (state courts are free to interpret their constitutions so as to enhance constitutional liberties); State v. Hunt, 91 N.J. 338 (1982) (N.J. affords greater protection of telephone billing records than does federal law); State v. Alston, 88 N.J. 211 (1981), (standing to challenge search and seizure); State v. Johnson, 68 N.J. 349 (1975) (consent to search); and State v. Novembrino, 105 N.J. 95 (1987) (no good faith exception to the exclusionary rule).
[3] In as far back as 1927, Justice Brandeis wrote in a famous and often quoted dissent that "[the founders] conferred, as against the government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men." Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928).
[4] Since Kirk was decided, several state courts have, for different reasons, invalidated roadblocks. Seattle v. Mesiani, 110 Wash.2d 454, 755 P.2d 775 (1988) (state constitution requires particularized suspicion for any governmental stop); State v. Henderson, 114 Idaho 293, 756 P.2d 1057 (1988) (roadblocks do not serve a legitimate public purpose sufficient to justify invasion of fundamental liberties under Brown v. Texas); State v. Boyanovsky, 304 Or. 131, 743 P.2d 711 (1987) and Nelson v. Lane County, 304 Or. 97, 743 P.2d 692 (1987) (state constitution requires particularized suspicion for any governmental stop).
[5] In as far back as 1849, Chief Justice Taney wrote in Smith v. Turner, 48 U.S. (7 How.) 283, 492, 12 L.Ed. 702, 790 (1849) that "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."
[6] It would be inherently unfair, when applying the balancing test, to place on one side of the scale the entire accumulated interest of the State and on the other side of the scale a single defendant's constitutionally protected fundamental liberties. A fairer balancing mechanism, and one called for by the plain language of Brown, see ante at 277-278, would weigh the actual benefits derived by the roadblock under scrutiny against all the liberties invaded by the government because of the subject roadblock. See Seattle v. Mesiani, supra, and State v. Tourtillott, 289 Or. 845, 618 P.2d 423 (1980) (Linde, J., dissenting). The State here introduced no evidence of seizures or arrests from elsewhere throughout this roadblock. Even if a few hundred more persons were seized and a few dozen more persons were arrested at other checkpoints throughout this roadblock, the imbalance here is no less substantial.
[7] The foregoing contains only suggested alternatives and is not intended to be exclusive. Law enforcement professionals are more competent than this court at devising constitutional means of obtaining articulable suspicion.
[8] Kirk quoted with approval the eloquent summary of this problem by Justice Feldman of the Supreme Court of Arizona:

The question has frightening implications. The thought that an American can be compelled to "show his papers" before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals. If roadblocks can be maintained to stop all persons, regardless of how innocent their conduct, for the purpose of investigating or apprehending drunk drivers, then presumably similar stops of all citizens could be undertaken for questioning and surveillance with regard to other crimes, such as possession of narcotics, possession of stolen property or burglary. It might be argued that if the law did permit such stops, we would have less crime. Nevertheless, our system is based on the idea that the risk of criminal activity is less of a danger than the risk of unfettered interference with personal liberty. [State ex rel. Ekstrom v. Justice Ct. of State, 136 Ariz. 1, 663 P.2d 992, 997 (1983) (Feldman, J., concurring); cited in 202 N.J. Super. at 52.]